## SCHALL, COMMISSIONER OF NEW YORK CITY DEPARTMENT OF JUVENILE JUSTICE v. MARTIN ET AL.

No. 82–1248.  Argued January 17, 1984—Decided June 4, 1984*

---

*Together with No. 82–1278, *Abrams, Attorney General of New York* v. *Martin et al.*, also on appeal from the same court.

*Judith A. Gordon,* Assistant Attorney General of New York, argued the cause for appellants in both cases. With her on the briefs for appellant in No. 82–1278 were *Robert Abrams,* Attorney General, *pro se, Peter H. Schiff, Melvyn R. Leventhal,* Deputy First Assistant Attorney General, *George D. Zuckerman,* Deputy Solicitor General, and *Robert J. Schack,* Assistant Attorney General. *Frederick A. O. Schwarz, Jr., Leonard Koerner,* and *Ronald E. Sternberg* filed a brief for appellant in No. 82–1248.

*Martin Guggenheim* argued the cause for appellees in both cases. With him on the brief were *Burt Neuborne, Janet R. Fink,* and *Charles A. Hollander.*†

---

†A brief of *amici curiae* urging reversal was filed for the Commonwealth of Pennsylvania et al. by *LeRoy S. Zimmerman,* Attorney General of Pennsylvania, *Kathleen F. McGrath,* Deputy Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Charles Graddick* of Alabama, *Norman C. Gorsuch* of Alaska, *Robert K. Corbin* of

JUSTICE REHNQUIST delivered the opinion of the Court.

Section 320.5(3)(b) of the New York Family Court Act authorizes pretrial detention of an accused juvenile delinquent based on a finding that there is a "serious risk" that the child "may before the return date commit an act which if committed by an adult would constitute a crime."[1] Appellees brought suit on behalf of a class of all juveniles detained pur-

Arizona, *John K. Van De Kamp* of California, *Jim Smith* of Florida, *Tany S. Hong* of Hawaii, *Jim Jones* of Idaho, *Neil F. Hartigan* of Illinois, *Linley E. Pearson* of Indiana, *Robert T. Stephan* of Kansas, *William J. Guste, Jr.,* of Louisiana, *Frank J. Kelley* of Michigan, *Michael T. Greeley* of Montana, *Paul L. Douglas* of Nebraska, *Gregory H. Smith* of New Hampshire, *Anthony J. Celebrezze, Jr.,* of Ohio, *Dave Frohnmayer* of Oregon, *T. Travis Medlock* of South Carolina, *David L. Wilkinson* of Utah, *John J. Easton, Jr.,* of Vermont, *Kenneth O. Eikenberry* of Washington, *A. G. McClintock* of Wyoming, and *Aviata F. Faalevao* of American Samoa.

Briefs of *amici curiae* urging affirmance were filed for the American Bar Association by *Wallace D. Riley, Andrew J. Shookhoff,* and *Steven H. Goldblatt;* for the Association for Children of New Jersey by *Dennis S. Brotman;* for the National Juvenile Law Center by *Harry F. Swanger;* for the National Legal Aid and Defender Association by *Michael J. Dale;* for the Public Defender Service for the District of Columbia by *Francis D. Carter* and *James H. McComas;* and for the Youth Law Center et al. by *Mark I. Soler, Loren M. Warboys, James R. Bell,* and *Robert G. Schwartz.*

*David Crump* filed a brief for the Texas District and County Attorneys Association et al. as *amici curiae.*

[1] New York Jud. Law § 320.5 (McKinney 1983) (Family Court Act (hereinafter FCA)) provides, in relevant part:

"1. At the initial appearance, the court in its discretion may release the respondent or direct his detention.

. . . . .

"3. The court shall not direct detention unless it finds and states the facts and reasons for so finding that unless the respondent is detained;

"(a) there is a substantial probability that he will not appear in court on the return date; or

"(b) there is a serious risk that he may before the return date commit an act which if committed by an adult would constitute a crime."

Appellees have only challenged pretrial detention under § 320.5(3)(b). Thus, the propriety of detention to ensure that a juvenile appears in court on the return date, pursuant to § 320.5(3)(a), is not before the Court.

suant to that provision.[2]  The District Court struck down § 320.5(3)(b) as permitting detention without due process of law and ordered the immediate release of all class members. *United States ex rel. Martin* v. *Strasburg,* 513 F. Supp. 691 (SDNY 1981).  The Court of Appeals for the Second Circuit affirmed, holding the provision "unconstitutional as to all juveniles" because the statute is administered in such a way that "the detention period serves as punishment imposed without proof of guilt established according to the requisite constitutional standard." *Martin* v. *Strasburg,* 689 F. 2d 365, 373–374 (1982).  We noted probable jurisdiction, 460 U. S. 1079 (1983),[3] and now reverse.  We conclude that preventive detention under the FCA serves a legitimate state

---

[2] The original challenge was to § 739(a)(ii) of the FCA, which, at the time of the commencement of this suit, governed pretrial release or detention of both alleged juvenile delinquents and persons in need of supervision. Effective July 1, 1983, a new Article 3 to the Act governs, *inter alia,* "all juvenile delinquency actions and proceedings commenced upon or after the effective date thereof and all appeals and other post-judgment proceedings relating or attaching thereto." FCA § 301.3(1).  Article 7 now applies only to proceedings concerning persons in need of supervision.

Obviously, this Court must "review the judgment below in light of the . . . statute as it now stands, not as it once did." *Hall* v. *Beals,* 396 U. S. 45, 48 (1969).  But since new Article 3 contains a preventive detention section identical to former § 739(a)(ii), see FCA § 320.5(3), the appeal is not moot. *Brockington* v. *Rhodes,* 396 U. S. 41, 43 (1969).

[3] Although the pretrial detention of the class representatives has long since ended, see *infra,* at 257–261, this case is not moot for the same reason that the class action in *Gerstein* v. *Pugh,* 420 U. S. 103, 110, n. 11 (1975), was not mooted by the termination of the claims of the named plaintiffs.

"Pretrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted.  The individual could nonetheless suffer repeated deprivations, and it is certain that other persons similarly situated will be detained under the allegedly unconstitutional procedures. The claim, in short, is one that is distinctly 'capable of repetition, yet evading review.' "

See also *People ex rel. Wayburn* v. *Schupf,* 39 N. Y. 2d 682, 686–687, 350 N. E. 2d 906, 907–908 (1976).

objective, and that the procedural protections afforded pre-trial detainees by the New York statute satisfy the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## I

Appellee Gregory Martin was arrested on December 13, 1977, and charged with first-degree robbery, second-degree assault, and criminal possession of a weapon based on an incident in which he, with two others, allegedly hit a youth on the head with a loaded gun and stole his jacket and sneakers. See Petitioners' Exhibit 1b. Martin had possession of the gun when he was arrested. He was 14 years old at the time and, therefore, came within the jurisdiction of New York's Family Court.[4] The incident occurred at 11:30 at night, and Martin lied to the police about where and with whom he lived. He was consequently detained overnight.[5]

---

[4] In New York, a child over the age of 7 but less than 16 is not considered criminally responsible for his conduct. FCA § 301.2(1). If he commits an act that would constitute a crime if committed by an adult, he comes under the exclusive jurisdiction of the Family Court. § 302.1(1). That court is charged not with finding guilt and affixing punishment, *In re Bogart*, 45 Misc. 2d 1075, 259 N. Y. S. 2d 351 (1963), but rather with determining and pursuing the needs and best interests of the child insofar as those are consistent with the need for the protection of the community. FCA § 301.1. See *In re Craig S.*, 57 App. Div. 2d 761, 394 N. Y. S. 2d 200 (1977). Juvenile proceedings are, thus, civil rather than criminal, although because of the restrictions that may be placed on a juvenile adjudged delinquent, some of the same protections afforded accused adult criminals are also applicable in this context. Cf. FCA § 303.1.

[5] When a juvenile is arrested, the arresting officer must immediately notify the parent or other person legally responsible for the child's care. FCA § 305.2(3). Ordinarily, the child will be released into the custody of his parent or guardian after being issued an "appearance ticket" requiring him to meet with the probation service on a specified day. § 307.1(1). See n. 9, *infra*. If, however, he is charged with a serious crime, one of several designated felonies, see § 301.2(8), or if his parent or guardian cannot be reached, the juvenile may be taken directly before the Family Court. § 305.2. The Family Court judge will make a preliminary deter-

A petition of delinquency was filed,[6] and Martin made his "initial appearance" in Family Court on December 14th, accompanied by his grandmother.[7] The Family Court Judge, citing the possession of the loaded weapon, the false address given to the police, and the lateness of the hour, as evidencing a lack of supervision, ordered Martin detained under § 320.5(3)(b) (at that time § 739(a)(ii); see n. 2, *supra*). A probable-cause hearing was held five days later, on December 19th, and probable cause was found to exist for all the crimes charged. At the factfinding hearing held December 27–29, Martin was found guilty on the robbery and criminal possession charges. He was adjudicated a delinquent and

---

mination as to the jurisdiction of the court, appoint a law guardian for the child, and advise the child of his or her rights, including the right to counsel and the right to remain silent.

Only if, as in Martin's case, the Family Court is not in session and special circumstances exist, such as an inability to notify the parents, will the child be taken directly by the arresting officer to a juvenile detention facility. § 305.2(4)(c). If the juvenile is so detained, he must be brought before the Family Court within 72 hours or the next day the court is in session, whichever is sooner. § 307.3(4). The propriety of such detention, prior to a juvenile's initial appearance in Family Court, is not at issue in this case. Appellees challenged only judicially ordered detention pursuant to § 320.5(3)(b).

[6] A delinquency petition, prepared by the "presentment agency," originates delinquency proceedings. FCA § 310.1. The petition must contain, *inter alia*, a precise statement of each crime charged and factual allegations which "clearly apprise" the juvenile of the conduct which is the subject of the accusation. § 311.1. A petition is not deemed sufficient unless the allegations of the factual part of the petition, together with those of any supporting depositions which may accompany it, provide reasonable cause to believe that the juvenile committed the crime or crimes charged. § 311.2(2). Also, nonhearsay allegations in the petition and supporting deposition must establish, if true, every element of each crime charged and the juvenile's commission thereof. § 311.2(3). The sufficiency of a petition may be tested by filing a motion to dismiss under § 315.1.

[7] The first proceeding in Family Court following the filing of the petition is known as the initial appearance even if the juvenile has already been brought before the court immediately following his arrest. FCA § 320.2.

placed on two years' probation.[8]   He had been detained pursuant to § 320.5(3)(b), between the initial appearance and the completion of the factfinding hearing, for a total of 15 days.

Appellees Luis Rosario and Kenneth Morgan, both age 14, were also ordered detained pending their factfinding hearings.   Rosario was charged with attempted first-degree robbery and second-degree assault for an incident in which he, with four others, allegedly tried to rob two men, putting a gun to the head of one of them and beating both about the head with sticks.   See Petitioners' Exhibit 2b.   At the time of his initial appearance, on March 15, 1978, Rosario had another delinquency petition pending for knifing a student, and two prior petitions had been adjusted.[9]   Probable cause was

---

[8] The "factfinding" is the juvenile's analogue of a trial.   As in the earlier proceedings, the juvenile has a right to counsel at this hearing.   § 341.2. See *In re Gault*, 387 U. S. 1 (1967).   Evidence may be suppressed on the same grounds as in criminal cases, FCA § 330.2, and proof of guilt, based on the record evidence, must be beyond a reasonable doubt, § 342.2.   See *In re Winship*, 397 U. S. 358 (1970).   If guilt is established, the court enters an appropriate order and schedules a dispositional hearing.   § 345.1.

The dispositional hearing is the final and most important proceeding in the Family Court.   If the juvenile has committed a designated felony, the court must order a probation investigation and a diagnostic assessment. § 351.1.   Any other material and relevant evidence may be offered by the probation agency or the juvenile.   Both sides may call and cross-examine witnesses and recommend specific dispositional alternatives.   § 350.4. The court must find, based on a preponderance of the evidence, § 350.3(2), that the juvenile is delinquent and requires supervision, treatment, or confinement.   § 352.1.   Otherwise, the petition is dismissed.   *Ibid.*

If the juvenile is found to be delinquent, then the court enters an order of disposition.   Possible alternatives include a conditional discharge; probation for up to two years; nonsecure placement with, perhaps, a relative or the Division for Youth; transfer to the Commissioner of Mental Health; or secure placement.   §§ 353.1–353.5.   Unless the juvenile committed one of the designated felonies, the court must order the least restrictive available alternative consistent with the needs and best interests of the juvenile and the need for protection of the community.   § 352.2(2).

[9] Every accused juvenile is interviewed by a member of the staff of the Probation Department.   This process is known as "probation intake."   See

found on March 21.   On April 11, Rosario was released to his father, and the case was terminated without adjustment on September 25, 1978.

Kenneth Morgan was charged with attempted robbery and attempted grand larceny for an incident in which he and another boy allegedly tried to steal money from a 14-year-old girl and her brother by threatening to blow their heads off and grabbing them to search their pockets.   See Petitioners' Exhibit 3b.   Morgan, like Rosario, was on release status on another petition (for robbery and criminal possession of stolen property) at the time of his initial appearance on March 27, 1978.   He had been arrested four previous times, and his mother refused to come to court because he had been in trouble so often she did not want him home.   A probable-cause hearing was set for March 30, but was continued until April 4, when it was combined with a factfinding hearing. Morgan was found guilty of harassment and petit larceny and was ordered placed with the Department of Social Services for 18 months.   He was detained a total of eight days between his initial appearance and the factfinding hearing.

On December 21, 1977, while still in preventive detention pending his factfinding hearing, Gregory Martin instituted a

---

Testimony of Mr. Benjamin (Supervisor, New York Dept. of Probation), App. 142.   In the course of the interview, which lasts an average of 45 minutes, the probation officer will gather what information he can about the nature of the case, the attitudes of the parties involved, and the child's past history and current family circumstances.   *Id.*, at 144, 153.   His sources of information are the child, his parent or guardian, the arresting officer, and any records of past contacts between the child and the Family Court.   On the basis of this interview, the probation officer may attempt to "adjust," or informally resolve, the case.   FCA § 308.1(2).   Adjustment is a purely voluntary process in which the complaining witness agrees not to press the case further, while the juvenile is given a warning or agrees to counseling sessions or, perhaps, referral to a community agency.   § 308.1 (Practice Commentary).   In cases involving designated felonies or other serious crimes, adjustment is not permitted without written approval of the Family Court.   § 308.1(4).   If a case is not informally adjusted, it is referred to the "presentment agency."   See n. 6, *supra.*

habeas corpus class action on behalf of "those persons who are, or during the pendency of this action will be, preventively detained pursuant to" § 320.5(3)(b) of the FCA. Rosario and Morgan were subsequently added as additional named plaintiffs. These three class representatives sought a declaratory judgment that § 320.5(3)(b) violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

In an unpublished opinion, the District Court certified the class. App. 20–32.[10] The court also held that appellees were not required to exhaust their state remedies before resorting to federal habeas because the highest state court had already rejected an identical challenge to the juvenile preventive detention statute. See *People ex rel. Wayburn* v. *Schupf*, 39 N. Y. 2d 682, 350 N. E. 2d 906 (1976). Exhaustion of state remedies, therefore, would be "an exercise in futility." App. 26.

At trial, appellees offered in evidence the case histories of 34 members of the class, including the three named petitioners. Both parties presented some general statistics on the relation between pretrial detention and ultimate disposition. In addition, there was testimony concerning juvenile proceedings from a number of witnesses, including a legal aid attorney specializing in juvenile cases, a probation supervisor, a child psychologist, and a Family Court Judge. On the basis of this evidence, the District Court rejected the equal protection challenge as "insubstantial,"[11] but agreed with appellees that pretrial detention under the FCA violates due process.[12]

---

[10] We have never decided whether Federal Rule of Civil Procedure 23, providing for class actions, is applicable to petitions for habeas corpus relief. See *Bell* v. *Wolfish*, 441 U. S. 520, 527, n. 6 (1979); *Middendorf* v. *Henry*, 425 U. S. 25, 30 (1976). Although appellants contested the class certification in the District Court, they did not raise the issue on appeal; nor do they urge it here. Again, therefore, we have no occasion to reach the question.

[11] The equal protection claim, which was neither raised on appeal nor decided by the Second Circuit, is not before us.

[12] The District Court gave three reasons for this conclusion. First, under the FCA, a juvenile may be held in pretrial detention for up to five

The court ordered that "all class members in custody pursuant to Family Court Act Section [320.5(3)(b)] shall be released forthwith." *Id.*, at 93.

The Court of Appeals affirmed. After reviewing the trial record, the court opined that "the vast majority of juveniles detained under [§ 320.5(3)(b)] either have their petitions dismissed before an adjudication of delinquency or are released after adjudication." 689 F. 2d, at 369. The court concluded from that fact that § 320.5(3)(b) "is utilized principally, not for preventive purposes, but to impose punishment for unadjudicated criminal acts." *Id.*, at 372. The early release of so many of those detained contradicts any asserted need for pretrial confinement to protect the community. The court therefore concluded that § 320.5(3)(b) must be declared unconstitutional as to all juveniles. Individual litigation would be a practical impossibility because the periods of detention are so short that the litigation is mooted before the merits are determined.[13]

days without any judicial determination of probable cause. Relying on *Gerstein* v. *Pugh*, 420 U. S., at 114, the District Court concluded that pretrial detention without a prior adjudication of probable cause is, itself, a *per se* violation of due process. *United States ex rel. Martin* v. *Strasburg*, 513 F. Supp. 691, 717 (SDNY 1981).

Second, after a review of the pertinent scholarly literature, the court noted that "no diagnostic tools have as yet been devised which enable even the most highly trained criminologists to predict reliably which juveniles will engage in violent crime." *Id.*, at 708. *A fortiori*, the court concluded, a Family Court judge cannot make a reliable prediction based on the limited information available to him at the initial appearance. *Id.*, at 712. Moreover, the court felt that the trial record was "replete" with examples of arbitrary and capricious detentions. *Id.*, at 713.

Finally, the court concluded that preventive detention is merely a euphemism for punishment imposed without an adjudication of guilt. The alleged purpose of the detention—to protect society from the juvenile's criminal conduct—is indistinguishable from the purpose of post-trial detention. And given "the inability of trial judges to predict which juveniles will commit crimes," there is no rational connection between the decision to detain and the alleged purpose, even if that purpose were legitimate. *Id.*, at 716.

[13] Judge Newman concurred separately. He was not convinced that the record supported the majority's statistical conclusions. But he thought

## II

There is no doubt that the Due Process Clause is applicable in juvenile proceedings. "The problem," we have stressed, "is to ascertain the precise impact of the due process requirement upon such proceedings." *In re Gault*, 387 U. S. 1, 13–14 (1967). We have held that certain basic constitutional protections enjoyed by adults accused of crimes also apply to juveniles. See *id.*, at 31–57 (notice of charges, right to counsel, privilege against self-incrimination, right to confrontation and cross-examination); *In re Winship*, 397 U. S. 358 (1970) (proof beyond a reasonable doubt); *Breed v. Jones*, 421 U. S. 519 (1975) (double jeopardy). But the Constitution does not mandate elimination of all differences in the treatment of juveniles. See, *e. g.*, *McKeiver v. Pennsylvania*, 403 U. S. 528 (1971) (no right to jury trial). The State has "a *parens patriae* interest in preserving and promoting the welfare of the child," *Santosky v. Kramer*, 455 U. S. 745, 766 (1982), which makes a juvenile proceeding fundamentally different from an adult criminal trial. We have tried, therefore, to strike a balance—to respect the "informality" and "flexibility" that characterize juvenile proceedings, *In re Winship, supra*, at 366, and yet to ensure that such proceedings comport with the "fundamental fairness" demanded by the Due Process Clause. *Breed v. Jones, supra*, at 531; *McKeiver, supra*, at 543 (plurality opinion).

The statutory provision at issue in these cases, § 320.5(3)(b), permits a brief pretrial detention based on a finding of a "serious risk" that an arrested juvenile may commit a crime before his return date. The question before us is whether preventive detention of juveniles pursuant to § 320.5(3)(b) is compatible with the "fundamental fairness" required by due process. Two separate inquiries are necessary to answer this question. First, does preventive detention under the

---

that the statute was procedurally infirm because it granted unbridled discretion to Family Court judges to make an inherently uncertain prediction of future criminal behavior. 689 F. 2d, at 377.

New York statute serve a legitimate state objective?  See *Bell* v. *Wolfish*, 441 U. S. 520, 534, n. 15 (1979); *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 168–169 (1963).  And, second, are the procedural safeguards contained in the FCA adequate to authorize the pretrial detention of at least some juveniles charged with crimes?  See *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976); *Gerstein* v. *Pugh*, 420 U. S. 103, 114 (1975).

## A

Preventive detention under the FCA is purportedly designed to protect the child and society from the potential consequences of his criminal acts.  *People ex rel. Wayburn* v. *Schupf*, 39 N. Y. 2d, at 689–690, 350 N. E. 2d, at 910. When making any detention decision, the Family Court judge is specifically directed to consider the needs and best interests of the juvenile as well as the need for the protection of the community.  FCA § 301.1; *In re Craig S.*, 57 App. Div. 2d 761, 394 N. Y. S. 2d 200 (1977).  In *Bell* v. *Wolfish*, *supra*, at 534, n. 15, we left open the question whether any governmental objective other than ensuring a detainee's presence at trial may constitutionally justify pretrial detention.  As an initial matter, therefore, we must decide whether, in the context of the juvenile system, the combined interest in protecting both the community and the juvenile himself from the consequences of future criminal conduct is sufficient to justify such detention.

The "legitimate and compelling state interest" in protecting the community from crime cannot be doubted.  *De Veau* v. *Braisted*, 363 U. S. 144, 155 (1960).  See also *Terry* v. *Ohio*, 392 U. S. 1, 22 (1968).  We have stressed before that crime prevention is "a weighty social objective," *Brown* v. *Texas*, 443 U. S. 47, 52 (1979), and this interest persists undiluted in the juvenile context.  See *In re Gault*, *supra*, at 20, n. 26.  The harm suffered by the victim of a crime is not de-

pendent upon the age of the perpetrator.[14]   And the harm to society generally may even be greater in this context given the high rate of recidivism among juveniles.   *In re Gault, supra,* at 22.

The juvenile's countervailing interest in freedom from institutional restraints, even for the brief time involved here, is undoubtedly substantial as well.   See *In re Gault, supra,* at 27.   But that interest must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody.   *Lehman* v. *Lycoming County Children's Services,* 458 U. S. 502, 510–511 (1982); *In re Gault, supra,* at 17. Children, by definition, are not assumed to have the capacity to take care of themselves.   They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae.*   See *State* v. *Gleason,* 404 A. 2d 573, 580 (Me. 1979); *People ex rel. Wayburn* v. *Schupf, supra,* at 690, 350 N. E. 2d, at 910; *Baker* v. *Smith,* 477 S. W. 2d 149, 150–151 (Ky. App. 1971). In this respect, the juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's *"parens patriae* interest in preserving and promoting the welfare of the child." *Santosky* v. *Kramer, supra,* at 766.

The New York Court of Appeals, in upholding the statute at issue here, stressed at some length "the desirability of protecting the juvenile from his own folly." *People ex rel. Wayburn* v. *Schupf, supra,* at 688–689, 350 N. E. 2d, at 909.[15]

---

[14] In 1982, juveniles under 16 accounted for 7.5 percent of all arrests for violent crimes, 19.9 percent of all arrests for serious property crime, and 17.3 percent of all arrests for violent and serious property crimes combined.   U. S. Dept. of Justice, Federal Bureau of Investigation, Crime in the United States 176–177 (1982) ("violent crimes" include murder, nonnegligent manslaughter, forcible rape, robbery, and aggravated assault; "serious property crimes" include burglary, larceny-theft, motor vehicle theft, and arson).

[15] "Our society recognizes that juveniles in general are in the earlier stages of their emotional growth, that their intellectual development is

Society has a legitimate interest in protecting a juvenile from the consequences of his criminal activity—both from potential physical injury which may be suffered when a victim fights back or a policeman attempts to make an arrest and from the downward spiral of criminal activity into which peer pressure may lead the child. See *L. O. W.* v. *District Court of Arapahoe*, 623 P. 2d 1253, 1258–1259 (Colo. 1981); *Morris* v. *D'Amario*, 416 A. 2d 137, 140 (R. I. 1980). See also *Eddings* v. *Oklahoma*, 455 U. S. 104, 115 (1982) (minority "is a time and condition of life when a person may be most susceptible to influence and to psychological damage"); *Bellotti* v. *Baird*, 443 U. S. 622, 635 (1979) (juveniles "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them").

The substantiality and legitimacy of the state interests underlying this statute are confirmed by the widespread use and judicial acceptance of preventive detention for juveniles. Every State, as well as the United States in the District of

---

incomplete, that they have had only limited practical experience, and that their value systems have not yet been clearly identified or firmly adopted. . . .

"For the same reasons that our society does not hold juveniles to an adult standard of responsibility for their conduct, our society may also conclude that there is a greater likelihood that a juvenile charged with delinquency, if released, will commit another criminal act than that an adult charged with crime will do so. To the extent that self-restraint may be expected to constrain adults, it may not be expected to operate with equal force as to juveniles. Because of the possibility of juvenile delinquency treatment and the absence of second-offender sentencing, there will not be the deterrent for the juvenile which confronts the adult. Perhaps more significant is the fact that in consequence of lack of experience and comprehension the juvenile does not view the commission of what are criminal acts in the same perspective as an adult. . . . There is the element of gamesmanship and the excitement of 'getting away' with something and the powerful inducement of peer pressures. All of these commonly acknowledged factors make the commission of criminal conduct on the part of juveniles in general more likely than in the case of adults." *People ex rel. Wayburn* v. *Schupf*, 39 N. Y. 2d, at 687–688, 350 N. E. 2d, at 908–909.

Columbia, permits preventive detention of juveniles accused of crime.[16] A number of model juvenile justice Acts also contain provisions permitting preventive detention.[17] And the

---

[16] Ala. Code § 12–15–59 (1975); Alaska Stat. Ann. § 47.10.140 (1979); Rule 3, Ariz. Juv. Ct. Rules of Proc., Ariz. Rev. Stat. Ann. (Supp. 1983–1984 to vol. 17A); Ark. Stat. Ann. § 45–421 (Supp. 1983); Cal. Welf. & Inst. Code Ann. § 628 (West Supp. 1984); Colo. Rev. Stat. § 19–2–102 (Supp. 1983); Conn. Gen. Stat. § 46b–131 (Supp. 1984); Del. Fam. Ct. Rule 60 (1981); D. C. Code § 16–2310 (1981); Fla. Stat. § 39.032 (Supp. 1984); Ga. Code Ann. § 15–11–19 (1982); Haw. Rev. Stat. § 571–31.1 (Supp. 1984); Idaho Code § 16–1811 (Supp. 1983); Ill. Rev. Stat., ch. 37, § 703–4 (1983); Ind. Code § 31–6–4–5 (1982); Iowa Code § 232.22 (1983); Kan. Stat. Ann. § 38–1632 (Supp. 1983); Ky. Rev. Stat. § 208.192 (1982); La. Code Juv. Proc. Ann., Art. 40 (West 1983 Pamphlet); Me. Rev. Stat. Ann., Tit. 15, § 3203 (1964 and Supp. 1983–1984); Md. Cts. & Jud. Proc. Code Ann. § 3–815 (1984); Mass. Gen. Laws Ann., ch. 119, § 66 (West Supp. 1983–1984); Mich. Comp. Laws § 712A.15 (1979); Minn. Stat. § 260.171 (1982); Miss. Code Ann. § 43–23–11 (1972); Mo. Juv. Ct. Rule 111.02 (1981); Mont. Code Ann. § 41–5–305 (1983); Neb. Rev. Stat. § 43–255 (Supp. 1982); Nev. Rev. Stat. § 62.140 (1983); N. H. Rev. Stat. Ann. § 169B:14 (Supp. 1983); N. J. Stat. Ann. § 2A:4–56 (Supp. 1983–1984); N. M. Stat. Ann. § 32–1–24 (1981); N. Y. FCA § 320.5(3) (McKinney 1983); N. C. Gen. Stat. § 7A–574 (Supp. 1983); N. D. Cent. Code § 27–20–14 (1974); Ohio Rev. Code Ann. § 2151.311 (1976); Okla. Stat., Tit. 10, § 1107 (Supp. 1983); Ore. Rev. Stat. § 419.573 (1983); 42 Pa. Cons. Stat. § 6325 (1982); R. I. Gen. Laws §§ 14–1–20, 14–1–21 (1981); S. C. Code § 20–7–600 (Supp. 1983); S. D. Codified Laws § 26–8–19.2 (Supp. 1983); Tenn. Code Ann. § 37–1–114 (1984); Tex. Fam. Code Ann. § 53.02 (1975 and Supp. 1984); Utah Code Ann. § 78–3a–30 (Supp. 1983); Vt. Stat. Ann., Tit. 33, § 643 (1981); Va. Code § 16.1–248 (1982); Wash. Rev. Code § 13.40.040 (1983); W. Va. Code § 49–5–8 (Supp. 1983); Wis. Stat. § 48.208 (1981–1982); Wyo. Stat. § 14–6–206 (1977).

[17] See U. S. Dept. of Justice, Office of Juvenile Justice and Delinquency Prevention, Standards for the Administration of Juvenile Justice, Report of the National Advisory Committee for Juvenile Justice and Delinquency Prevention 294–296 (July 1980); Uniform Juvenile Court Act § 14, 9A U. L. A. 22 (1979); Standard Juvenile Court Act, Art. IV, § 16, proposed by the National Council on Crime and Delinquency (1959); W. Sheridan, Legislative Guide for Drafting Family and Juvenile Court Acts § 20(a)(1) (Dept. of HEW, Children's Bureau, Pub. No. 472–1969); see also Standards for Juvenile and Family Courts 62–63 (Dept. of HEW, Children's Bureau,

courts of eight States, including the New York Court of Appeals, have upheld their statutes with specific reference to protecting the juvenile and the community from harmful pretrial conduct, including pretrial crime. *L. O. W.* v. *District Court of Arapahoe, supra,* at 1258–1259; *Morris* v. *D'Amario, supra,* at 139–140; *State* v. *Gleason,* 404 A. 2d, at 583; *Pauley* v. *Gross,* 1 Kan. App. 2d 736, 738–740, 574 P. 2d 234, 237–238 (1977); *People ex rel. Wayburn* v. *Schupf,* 39 N. Y. 2d, at 688–689, 350 N. E. 2d, at 909–910; *Aubrey* v. *Gadbois,* 50 Cal. App. 3d 470, 472, 123 Cal. Rptr. 365, 366 (1975); *Baker* v. *Smith,* 477 S. W. 2d, at 150–151; *Commonwealth ex rel. Sprowal* v. *Hendrick,* 438 Pa. 435, 438–439, 265 A. 2d 348, 349–350 (1970).

"The fact that a practice is followed by a large number of states is not conclusive in a decision as to whether that practice accords with due process, but it is plainly worth considering in determining whether the practice 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' *Snyder* v. *Massachusetts,* 291 U. S. 97, 105 (1934)." *Leland* v. *Oregon,* 343 U. S. 790, 798 (1952). In light of the uniform legislative judgment that pretrial detention of juveniles properly promotes the interests both of society and the juvenile, we conclude that the practice serves a legitimate regulatory purpose compatible with the "fundamental fairness" demanded by the Due Process Clause in juvenile proceedings. Cf. *McKeiver* v. *Pennsylvania,* 403 U. S., at 548 (plurality opinion).[18]

---

Pub. No. 437–1966). Cf. Institute of Judicial Administration/American Bar Association Project on Juvenile Justice Standards Relating to Interim Status: The Release, Control, and Detention of Accused Juvenile Offenders Between Arrest and Disposition § 3.2(B) (Tent. Draft 1977) (detention limited to "reducing the likelihood that the juvenile may inflict serious bodily harm on others during the interim").

[18] Appellees argue that some limit must be placed on the categories of crimes that detained juveniles must be accused of having committed or being likely to commit. But the discretion to delimit the categories of

Of course, the mere invocation of a legitimate purpose will not justify particular restrictions and conditions of confinement amounting to punishment. It is axiomatic that "[d]ue process requires that a pretrial detainee not be punished." *Bell* v. *Wolfish*, 441 U. S., at 535, n. 16. Even given, therefore, that pretrial detention may serve legitimate regulatory purposes, it is still necessary to determine whether the terms and conditions of confinement under § 320.5(3)(b) are in fact compatible with those purposes. *Kennedy* v. *Mendoza-Martinez*, 372 U. S., at 168–169. "A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell* v. *Wolfish, supra*, at 538. Absent a showing of an express intent to punish on the part of the State, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Kennedy* v. *Mendoza-Martinez, supra*, at 168–189. See *Bell* v. *Wolfish, supra*, at 538; *Flemming* v. *Nestor*, 363 U. S. 603, 613–614 (1960).

There is no indication in the statute itself that preventive detention is used or intended as a punishment. First of all, the detention is strictly limited in time. If a juvenile is detained at his initial appearance and has denied the charges

crimes justifying detention, like the discretion to define criminal offenses and prescribe punishments, resides wholly with the state legislatures. *Whalen* v. *United States*, 445 U. S. 684, 689 (1980); *Rochin* v. *California*, 342 U. S. 165, 168 (1952). See also *Rummel* v. *Estelle*, 445 U. S. 263, 275 (1980) ("the presence or absence of violence does not always affect the strength of society's interest in deterring a particular crime").

More fundamentally, this sort of attack on a criminal statute must be made on a case-by-case basis. *United States* v. *Raines*, 362 U. S. 17, 21 (1960). The Court will not sift through the entire class to determine whether the statute was constitutionally applied in each case. And, outside the limited First Amendment context, a criminal statute may not be attacked as overbroad. See *New York* v. *Ferber*, 458 U. S. 747 (1982).

against him, he is entitled to a probable-cause hearing to be held not more than three days after the conclusion of the initial appearance or four days after the filing of the petition, whichever is sooner. FCA § 325.1(2).[19] If the Family Court judge finds probable cause, he must also determine whether continued detention is necessary pursuant to § 320.5(3)(b). § 325.3(3).

Detained juveniles are also entitled to an expedited factfinding hearing. If the juvenile is charged with one of a limited number of designated felonies, the factfinding hearing must be scheduled to commence not more than 14 days after the conclusion of the initial appearance. § 340.1. If the juvenile is charged with a lesser offense, then the factfinding hearing must be held not more than three days after the initial appearance.[20] In the latter case, since the times for the probable-cause hearing and the factfinding hearing coincide, the two hearings are merged.

Thus, the maximum possible detention under § 320.5(3)(b) of a youth accused of a serious crime, assuming a 3-day extension of the factfinding hearing for good cause shown, is 17 days. The maximum detention for less serious crimes, again assuming a 3-day extension for good cause shown, is six days. These time frames seem suited to the limited purpose of providing the youth with a controlled environment and separating him from improper influences pending the speedy disposition of his case.

The conditions of confinement also appear to reflect the regulatory purposes relied upon by the State. When a juvenile is remanded after his initial appearance, he cannot, absent exceptional circumstances, be sent to a prison or lockup where he would be exposed to adult criminals. FCA

---

[19] For good cause shown, the court may adjourn the hearing, but for no more than three additional court days. FCA § 325.1(3).

[20] In either case, the court may adjourn the hearing for not more than three days for good cause shown. FCA § 340.1(3). The court must state on the record the reason for any adjournment. § 340.1(4).

§ 304.1(2). Instead, the child is screened by an "assessment unit" of the Department of Juvenile Justice. Testimony of Mr. Kelly (Deputy Commissioner of Operations, New York City Department of Juvenile Justice), App. 286–287. The assessment unit places the child in either nonsecure or secure detention. Nonsecure detention involves an open facility in the community, a sort of "halfway house," without locks, bars, or security officers where the child receives schooling and counseling and has access to recreational facilities. *Id.*, at 285; Testimony of Mr. Benjamin, *id.*, at 149–150.

Secure detention is more restrictive, but it is still consistent with the regulatory and *parens patriae* objectives relied upon by the State. Children are assigned to separate dorms based on age, size, and behavior. They wear street clothes provided by the institution and partake in educational and recreational programs and counseling sessions run by trained social workers. Misbehavior is punished by confinement to one's room. See Testimony of Mr. Kelly, *id.*, at 292–297. We cannot conclude from this record that the controlled environment briefly imposed by the State on juveniles in secure pretrial detention "is imposed for the purpose of punishment" rather than as "an incident of some other legitimate governmental purpose." *Bell* v. *Wolfish*, 441 U. S., at 538.

The Court of Appeals, of course, did conclude that the underlying purpose of § 320.5(3)(b) is punitive rather than regulatory. But the court did not dispute that preventive detention might serve legitimate regulatory purposes or that the terms and conditions of pretrial confinement in New York are compatible with those purposes. Rather, the court invalidated a significant aspect of New York's juvenile justice system based solely on some case histories and a statistical study which appeared to show that "the vast majority of juveniles detained under [§ 320.5(3)(b)] either have their petitions dismissed before an adjudication of delinquency or are released after adjudication." 689 F. 2d, at 369. The court assumed that dismissal of a petition or failure to confine a juvenile at

the dispositional hearing belied the need to detain him prior to factfinding and that, therefore, the pretrial detention constituted punishment. *Id.*, at 373. Since punishment imposed without a prior adjudication of guilt is *per se* illegitimate, the Court of Appeals concluded that no juveniles could be held pursuant to § 320.5(3)(b).

There are some obvious flaws in the statistics and case histories relied upon by the lower court.[21] But even assuming it to be the case that "by far the greater number of juveniles incarcerated under [§ 320.5(3)(b)] will never be confined as a consequence of a disposition imposed after an adjudication of delinquency," 689 F. 2d, at 371–372, we find that to be an insufficient ground for upsetting the widely shared legislative judgment that preventive detention serves an important and legitimate function in the juvenile justice system. We are unpersuaded by the Court of Appeals' rather cavalier equation of detentions that do not lead to continued confinement after an adjudication of guilt and "wrongful" or "punitive" pretrial detentions.

Pretrial detention need not be considered punitive merely because a juvenile is subsequently discharged subject to con-

---

[21] For example, as the Court of Appeals itself admits, 689 F. 2d, at 369, n. 18, the statistical study on which it relied mingles indiscriminately detentions under § 320.5(3)(b) with detentions under § 320.5(3)(a). The latter provision applies only to juveniles who are likely not to appear on the return date if not detained, and appellees concede that such juveniles may be lawfully detained. Brief for Appellees 93. Furthermore, the 34 case histories on which the court relied were handpicked by appellees' counsel from over a 3-year period. Compare Petitioners' Exhibit 19a (detention of Geraldo Delgado on March 5, 1976) with Petitioners' Exhibit 35a (detention of James Ancrum on August 19, 1979). The Court of Appeals stated that appellants did not contest the representativeness of these case histories. 689 F. 2d, at 369, n. 19. Appellants argue, however, that there was no occasion to contest their representativeness because the case histories were not even offered by appellees as a representative sample, and were not evaluated by appellees' expert statistician or the District Court in that light. See Brief for Appellant in No. 82–1278, pp. 24–25, n.\*\*. We need not resolve this controversy.

ditions or put on probation. In fact, such actions reinforce the original finding that close supervision of the juvenile is required. Lenient but supervised disposition is in keeping with the Act's purpose to promote the welfare and development of the child.[22] As the New York Court of Appeals noted:

> "It should surprise no one that caution and concern for both the juvenile and society may indicate the more conservative decision to detain at the very outset, whereas the later development of very much more relevant information may prove that while a finding of delinquency was warranted, placement may not be indicated." *People ex rel. Wayburn* v. *Schupf*, 39 N. Y. 2d, at 690, 350 N. E. 2d, at 910.

Even when a case is terminated prior to factfinding, it does not follow that the decision to detain the juvenile pursuant to § 320.5(3)(b) amounted to a due process violation. A delinquency petition may be dismissed for any number of reasons collateral to its merits, such as the failure of a witness to testify. The Family Court judge cannot be expected to anticipate such developments at the initial hearing. He makes his decision based on the information available to him at that time, and the propriety of the decision must be judged in that light. Consequently, the final disposition of a case is "largely irrelevant" to the legality of a pretrial detention. *Baker* v. *McCollan*, 443 U. S. 137, 145 (1979).

It may be, of course, that in some circumstances detention of a juvenile would not pass constitutional muster. But the validity of those detentions must be determined on a case-by-case basis. Section 320.5(3)(b) is not invalid "on its face" by

---

[22] Judge Quinones testified that detention at disposition is considered a "harsh solution." At the dispositional hearing, the Family Court judge usually has "a much more complete picture of the youngster" and tries to tailor the least restrictive dispositional order compatible with that picture. Testimony of Judge Quinones, App. 279–281.

reason of the ambiguous statistics and case histories relied upon by the court below.[23] We find no justification for the conclusion that, contrary to the express language of the statute and the judgment of the highest state court, § 320.5(3)(b) is a punitive rather than a regulatory measure. Preventive detention under the FCA serves the legitimate state objective, held in common with every State in the country, of protecting both the juvenile and society from the hazards of pretrial crime.

## B

Given the legitimacy of the State's interest in preventive detention, and the nonpunitive nature of that detention, the remaining question is whether the procedures afforded juveniles detained prior to factfinding provide sufficient protection against erroneous and unnecessary deprivations of liberty. See *Mathews* v. *Eldridge*, 424 U. S., at 335.[24] In *Gerstein* v. *Pugh*, 420 U. S., at 114, we held that a judicial

---

[23] Several *amici* argue that similar statistics obtain throughout the country. See, *e. g.*, Brief for American Bar Association as *Amicus Curiae* 23; Brief for Association for Children of New Jersey as *Amicus Curiae* 8, 11; Brief for Youth Law Center et al. as *Amici Curiae* 13–14. But even if New York's experience were duplicated on a national scale, that fact would not lead us, as *amici* urge, to conclude that every State and the United States are illicitly punishing juveniles prior to their trial. On the contrary, if such statistics obtain nationwide, our conclusion is strengthened that the existence of the statistics in these cases is not a sufficient ground for striking down New York's statute. As already noted: "The fact that a practice is followed by a large number of states is not conclusive in a decision as to whether that practice accords with due process, but it is plainly worth considering in determining whether the practice 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' *Snyder* v. *Massachusetts*, 291 U. S. 97, 105 (1934)." *Leland* v. *Oregon*, 343 U. S. 790, 798 (1952).

[24] Appellees urge the alleged lack of procedural safeguards as an alternative ground for upholding the judgment of the Court of Appeals. Brief for Appellees 62–75. The court itself intimated that it would reach the same result on that ground, 689 F. 2d, at 373–374, and Judge Newman, in his concurrence, relied expressly on perceived procedural flaws in the statute. Accordingly, we deem it necessary to consider the question.

determination of probable cause is a prerequisite to any extended restraint on the liberty of an adult accused of crime. We did not, however, mandate a specific timetable. Nor did we require the "full panoply of adversary safeguards—counsel, confrontation, cross-examination, and compulsory process for witnesses." *Id.*, at 119. Instead, we recognized "the desirability of flexibility and experimentation by the States." *Id.*, at 123. *Gerstein* arose under the Fourth Amendment, but the same concern with "flexibility" and "informality," while yet ensuring adequate predetention procedures, is present in this context. *In re Winship*, 397 U. S., at 366; *Kent* v. *United States*, 383 U. S. 541, 554 (1966).

In many respects, the FCA provides far more predetention protection for juveniles than we found to be constitutionally required for a probable-cause determination for adults in *Gerstein*. The initial appearance is informal, but the accused juvenile is given full notice of the charges against him and a complete stenographic record is kept of the hearing. See 513 F. Supp., at 702. The juvenile appears accompanied by his parent or guardian.[25] He is first informed of his rights, including the right to remain silent and the right to be represented by counsel chosen by him or by a law guardian assigned by the court. FCA § 320.3. The initial appearance may be adjourned for no longer than 72 hours or until the next court day, whichever is sooner, to enable an appointed law guardian or other counsel to appear before the court. § 320.2(3). When his counsel is present, the juvenile is informed of the charges against him and furnished with a copy of the delinquency petition. § 320.4(1). A representative from the presentment agency appears in support of the petition.

The nonhearsay allegations in the delinquency petition and supporting depositions must establish probable cause to

---

[25] If the juvenile's parent or guardian fails to appear after reasonable and substantial efforts have been made to notify such person, the court must appoint a law guardian for the child. FCA § 320.3.

believe the juvenile committed the offense. Although the Family Court judge is not required to make a finding of probable cause at the initial appearance, the youth may challenge the sufficiency of the petition on that ground. FCA § 315.1. Thus, the juvenile may oppose any recommended detention by arguing that there is not probable cause to believe he committed the offense or offenses with which he is charged. If the petition is not dismissed, the juvenile is given an opportunity to admit or deny the charges. § 321.1.[26]

At the conclusion of the initial appearance, the presentment agency makes a recommendation regarding detention. A probation officer reports on the juvenile's record, including other prior and current Family Court and probation contacts, as well as relevant information concerning home life, school attendance, and any special medical or developmental problems. He concludes by offering his agency's recommendation on detention. Opposing counsel, the juvenile's parents, and the juvenile himself may all speak on his behalf and challenge any information or recommendation. If the judge does decide to detain the juvenile under § 320.5(3)(b), he must state on the record the facts and reasons for the detention.[27]

---

[26] If the child chooses to remain silent, he is assumed to deny the charges. FCA § 321.1. With the consent of the court and of the presentment agency, the child may admit to a lesser charge. If he wishes to admit to the charges or to a lesser charge, the court must, before accepting the admission, advise the child of his right to a factfinding hearing and of the possible specific dispositional orders that may result from the admission. *Ibid.* The court must also satisfy itself that the child actually did commit the acts to which he admits. *Ibid.*

With the consent of the victim or complainant and the juvenile, the court may also refer a case to the probation service for adjustment. If the case is subsequently adjusted, the petition is then dismissed. § 320.6.

[27] Given that under *Gerstein*, 420 U. S., at 119–123, a probable-cause hearing may be informal and nonadversarial, a Family Court judge could make a finding of probable cause at the initial appearance. That he is not required to do so does not, under the circumstances, amount to a deprivation of due process. Appellees fail to point to a single example where probable cause was not found after a decision was made to detain the child.

As noted, a detained juvenile is entitled to a formal, adversarial probable-cause hearing within three days of his initial appearance, with one 3-day extension possible for good cause shown.[28]   The burden at this hearing is on the presentment agency to call witnesses and offer evidence in support of the charges.   § 325.2.   Testimony is under oath and subject to cross-examination.   *Ibid.*   The accused juvenile may call witnesses and offer evidence in his own behalf.   If the court finds probable cause, the court must again decide whether continued detention is necessary under § 320.5(3)(b).   Again, the facts and reasons for the detention must be stated on the record.

In sum, notice, a hearing, and a statement of facts and reasons are given prior to any detention under § 320.5(3)(b).   A formal probable-cause hearing is then held within a short while thereafter, if the factfinding hearing is not itself scheduled within three days.   These flexible procedures have been found constitutionally adequate under the Fourth Amendment, see *Gerstein* v. *Pugh*, and under the Due Process Clause, see *Kent* v. *United States, supra,* at 557.   Appellees have failed to note any additional procedures that would significantly improve the accuracy of the determination without unduly impinging on the achievement of legitimate state purposes.[29]

---

[28] The Court in *Gerstein* indicated approval of pretrial detention procedures that supplied a probable-cause hearing within five days of the initial detention.   *Id.,* at 124, n. 25.   The brief delay in the probable-cause hearing may actually work to the advantage of the juvenile since it gives his counsel, usually appointed at the initial appearance pursuant to FCA § 320.2(2), time to prepare.

[29] Judge Newman, in his concurrence below, offered a list of statutory improvements.   These suggested changes included: limitations on the crimes for which the juvenile has been arrested or which he is likely to commit if released; a determination of the likelihood that the juvenile committed the crime; an assessment of the juvenile's background; and a more specific standard of proof.   The first and second of these suggestions have already been considered.   See nn. 18 and 27, *supra.*   We need only add to

Appellees argue, however, that the risk of erroneous and unnecessary detentions is too high despite these procedures because the standard for detention is fatally vague. Detention under § 320.5(3)(b) is based on a finding that there is a "serious risk" that the juvenile, if released, would commit a crime prior to his next court appearence. We have already seen that detention of juveniles on that ground serves legitimate regulatory purposes. But appellees claim, and the District Court agreed, that it is virtually impossible to predict future criminal conduct with any degree of accuracy. Moreover, they say, the statutory standard fails to channel the discretion of the Family Court judge by specifying the factors on which he should rely in making that prediction. The procedural protections noted above are thus, in their view, unavailing because the ultimate decision is intrinsically arbitrary and uncontrolled.

Our cases indicate, however, that from a legal point of view there is nothing inherently unattainable about a prediction of future criminal conduct. Such a judgment forms an important element in many decisions,[30] and we have specifically re-

---

the discussion in n. 18 that there is no indication that delimiting the category of crimes justifying detention would improve the accuracy of the § 320.5(3)(b) determination in any respect. The third and fourth suggestions are discussed in text, *infra*.

[30] See *Jurek* v. *Texas*, 428 U. S. 262, 274–275 (1976) (death sentence imposed by jury); *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1, 9–10 (1979) (grant of parole); *Morrissey* v. *Brewer*, 408 U. S. 471, 480 (1972) (parole revocation).

A prediction of future criminal conduct may also form the basis for an increased sentence under the "dangerous special offender" statute, 18 U. S. C. § 3575. Under § 3575(f), a "dangerous" offender is defined as an individual for whom "a period of confinement longer than that provided for such [underlying] felony is required for the protection of the public from further criminal conduct by the defendant." The statute has been challenged numerous times on the grounds that the standard is unconstitutionally vague. Every Court of Appeals considering the question has rejected that claim. *United States* v. *Davis*, 710 F. 2d 104, 108–109 (CA3), cert. denied, 464 U. S. 1001 (1983); *United States* v. *Schell*, 692 F. 2d 672,

jected the contention, based on the same sort of sociological data relied upon by appellees and the District Court, "that it is impossible to predict future behavior and that the question is so vague as to be meaningless." *Jurek* v. *Texas*, 428 U. S. 262, 274 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.); *id.*, at 279 (WHITE, J., concurring in judgment).

We have also recognized that a prediction of future criminal conduct is "an experienced prediction based on a host of variables" which cannot be readily codified. *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1, 16 (1979). Judge Quinones of the Family Court testified at trial that he and his colleagues make a determination under § 320.5(3)(b) based on numerous factors including the nature and seriousness of the charges; whether the charges are likely to be proved at trial; the juvenile's prior record; the adequacy and effectiveness of his home supervision; his school situation, if known; the time of day of the alleged crime as evidence of its seriousness and a possible lack of parental control; and any special circumstances that might be brought to his attention by the probation officer, the child's attorney, or any parents, relatives, or other responsible persons accompanying the child. Testimony of Judge Quinones, App. 254–267. The decision is based on as much information as can reasonably be obtained at the initial appearance. *Ibid.*

Given the right to a hearing, to counsel, and to a statement of reasons, there is no reason that the specific factors upon which the Family Court judge might rely must be specified in the statute. As the New York Court of Appeals concluded, *People ex rel. Wayburn* v. *Schupf*, 39 N. Y. 2d, at 690, 350 N. E. 2d, at 910, "to a very real extent Family Court must exercise a substitute parental control for which there can be

675–676 (CA10 1982); *United States* v. *Williamson*, 567 F. 2d 610, 613 (CA4 1977); *United States* v. *Bowdach*, 561 F. 2d 1160, 1175 (CA5 1977); *United States* v. *Neary*, 552 F. 2d 1184, 1194 (CA7), cert. denied, 434 U. S. 864 (1977); *United States* v. *Stewart*, 531 F. 2d 326, 336–337 (CA6), cert. denied, 426 U. S. 922 (1976).

no particularized criteria." There is also no reason, we should add, for a federal court to assume that a state court judge will not strive to apply state law as conscientiously as possible. *Sumner* v. *Mata*, 449 U. S. 539, 549 (1981).

It is worth adding that the Court of Appeals for the Second Circuit was mistaken in its conclusion that "[i]ndividual litigation . . . is a practical impossibility because the periods of detention are so short that the litigation is mooted before the merits are determined." 689 F. 2d, at 373. In fact, one of the juveniles in the very case histories upon which the court relied was released from pretrial detention on a writ of habeas corpus issued by the State Supreme Court. New York courts also have adopted a liberal view of the doctrine of "capable of repetition, yet evading review" precisely in order to ensure that pretrial detention orders are not unreviewable. In *People ex rel. Wayburn* v. *Schupf, supra,* at 686, 350 N. E. 2d, at 908, the court declined to dismiss an appeal from the grant of a writ of habeas corpus despite the technical mootness of the case.

> "Because the situation is likely to recur . . . and the substantial issue may otherwise never be reached (in view of the predictably recurring happenstance that, however expeditiously an appeal might be prosecuted, fact-finding and dispositional hearings normally will have been held and a disposition made before the appeal could reach us), . . . we decline to dismiss [the appeal] on the ground of mootness."

The required statement of facts and reasons justifying the detention and the stenographic record of the initial appearance will provide a basis for the review of individual cases. Pretrial detention orders in New York may be reviewed by writ of habeas corpus brought in State Supreme Court. And the judgment of that court is appealable as of right and may be taken directly to the Court of Appeals if a constitutional question is presented. N. Y. Civ. Prac. Law § 5601(b)(2)

(McKinney 1978). Permissive appeal from a Family Court order may also be had to the Appellate Division. FCA § 365.2. Or a motion for reconsideration may be directed to the Family Court judge. § 355.1(1)(b). These post-detention procedures provide a sufficient mechanism for correcting on a case-by-case basis any erroneous detentions ordered under § 320.5(3). Such procedures may well flesh out the standards specified in the statute.

### III

The dissent would apparently have us strike down New York's preventive detention statute on two grounds: first, because the preventive detention of juveniles constitutes poor public policy, with the balance of harms outweighing any positive benefits either to society or to the juveniles themselves, *post*, at 290–291, 308, and, second, because the statute could have been better drafted to improve the quality of the decisionmaking process, *post*, at 304–306. But it is worth recalling that we are neither a legislature charged with formulating public policy nor an American Bar Association committee charged with drafting a model statute. The question before us today is solely whether the preventive detention system chosen by the State of New York and applied by the New York Family Court comports with constitutional standards. Given the regulatory purpose for the detention and the procedural protections that precede its imposition, we conclude that § 320.5(3)(b) of the New York FCA is not invalid under the Due Process Clause of the Fourteenth Amendment.

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE STEVENS join, dissenting.

The New York Family Court Act governs the treatment of persons between 7 and 16 years of age who are alleged to have committed acts that, if committed by adults, would

constitute crimes.[1]  The Act contains two provisions that authorize the detention of juveniles arrested for offenses covered by the Act[2] for up to 17 days pending adjudication of their guilt.[3]  Section 320.5(3)(a) empowers a judge of the New York Family Court to order detention of a juvenile if he finds "there is a substantial probability that [the juvenile] will not appear in court on the return date."  Section 320.5(3)(b), the provision at issue in these cases, authorizes detention if the judge finds "there is a serious risk [the juvenile] may before the return date commit an act which if committed by an adult would constitute a crime."[4]

---

[1] N. Y. Jud. Law §§ 301.2(1), 302.1(1) (McKinney 1983) (hereinafter Family Court Act or FCA).   Children aged 13 or over accused of murder and children aged 14 or over accused of kidnaping, arson, rape, or a few other serious crimes are exempted from the coverage of the Act and instead are prosecuted as "juvenile offenders" in the adult criminal courts. N. Y. Penal Law §§ 10.00(18), 30.00(2) (McKinney Supp. 1983–1984).  For the sake of simplicity, offenses covered by the Family Court Act, as well as the more serious offenses enumerated above, hereinafter will be referred to generically as crimes.

[2] Ironically, juveniles arrested for very serious offenses, see n. 1, *supra*, are not subject to preventive detention under this or any other provision.

[3] Strictly speaking, "guilt" is never adjudicated under the Act; nor is the juvenile ever given a trial.   Rather, whether the juvenile committed the offense is ascertained in a "factfinding hearing."   In most respects, however, such a hearing is the functional equivalent of an ordinary criminal trial.   For example, the juvenile is entitled to counsel and the State bears the burden of demonstrating beyond a reasonable doubt that the juvenile committed the offense of which he is accused.   See FCA §§ 341.2(1), 342.2(2); cf. *In re Winship*, 397 U. S. 358 (1970); *In re Gault*, 387 U. S. 1 (1967) (establishing constitutional limitations on the form of such proceedings in recognition of the severity of their impact upon juveniles).   For convenience, the ensuing discussion will use the terminology associated with adult criminal proceedings when describing the treatment of juveniles in New York.

[4] At the time appellees first brought their suit, the pertinent portions of FCA § 320.5(3) were embodied in FCA § 739(a).   I agree with the majority that the reenactment of the crucial provision under a different numerical heading does not render the case moot.   See *ante*, at 256, n. 2.

There are few limitations on § 320.5(3)(b). Detention need not be predicated on a finding that there is probable cause to believe the child committed the offense for which he was arrested. The provision applies to all juveniles, regardless of their prior records or the severity of the offenses of which they are accused. The provision is not limited to the prevention of dangerous crimes; a prediction that a juvenile if released may commit a minor misdemeanor is sufficient to justify his detention. Aside from the reference to "serious risk," the requisite likelihood that the juvenile will misbehave before his trial is not specified by the statute.

The Court today holds that preventive detention of a juvenile pursuant to § 320.5(3)(b) does not violate the Due Process Clause. Two rulings are essential to the Court's decision: that the provision promotes legitimate government objectives important enough to justify the abridgment of the detained juveniles' liberty interests, *ante,* at 274; and that the provision incorporates procedural safeguards sufficient to prevent unnecessary or arbitrary impairment of constitutionally protected rights, *ante,* at 277, 279–280. Because I disagree with both of those rulings, I dissent.

I

The District Court made detailed findings, which the Court of Appeals left undisturbed, regarding the manner in which § 320.5(3)(b) is applied in practice. Unless clearly erroneous, those findings are binding upon us, see Fed. Rule Civ. Proc. 52(a), and must guide our analysis of the constitutional questions presented by these cases.

The first step in the process that leads to detention under § 320.5(3)(b) is known as "probation intake." A juvenile may arrive at intake by one of three routes: he may be brought there directly by an arresting officer; he may be detained for a brief period after his arrest and then taken to intake; he may be released upon arrest and directed to appear at a designated time. *United States ex rel. Martin* v. *Strasburg,*

513 F. Supp. 691, 701 (SDNY 1981). The heart of the intake procedure is a 10-to-40-minute interview of the juvenile, the arresting officer, and sometimes the juvenile's parent or guardian. The objectives of the probation officer conducting the interview are to determine the nature of the offense the child may have committed and to obtain some background information on him. *Ibid.*

On the basis of the information derived from the interview and from an examination of the juvenile's record, the probation officer decides whether the case should be disposed of informally ("adjusted") or whether it should be referred to the Family Court. If the latter, the officer makes an additional recommendation regarding whether the juvenile should be detained. "There do not appear to be any governing criteria which must be followed by the probation officer in choosing between proposing detention and parole . . . ." *Ibid.*

The actual decision whether to detain a juvenile under § 320.5(3)(b) is made by a Family Court judge at what is called an "initial appearance"—a brief hearing resembling an arraignment.[5] *Id.*, at 702. The information on which the judge makes his determination is very limited. He has before him a "petition for delinquency" prepared by a state agency, charging the juvenile with an offense, accompanied with one or more affidavits attesting to the juvenile's involvement. Ordinarily the judge has in addition the written report and recommendation of the probation officer. However, the probation officer who prepared the report rarely attends the hearing. *Ibid.* Nor is the complainant likely to appear. Consequently, "[o]ften there is no one present with personal knowledge of what happened." *Ibid.*

In the typical case, the judge appoints counsel for the juvenile at the time his case is called. Thus, the lawyer has no opportunity to make an independent inquiry into the juvenile's background or character, and has only a few minutes to

---

[5] If the juvenile is detained upon arrest, this hearing must be held on the next court day or within 72 hours, whichever comes first. FCA § 307.3(4).

prepare arguments on the child's behalf. *Id.*, at 702, 708. The judge ordinarily does not interview the juvenile, *id.*, at 708, makes no inquiry into the truth of allegations in the petition, *id.*, at 702, and does not determine whether there is probable cause to believe the juvenile committed the offense.[6] The typical hearing lasts between 5 and 15 minutes, and the judge renders his decision immediately afterward. *Ibid.*

Neither the statute nor any other body of rules guides the efforts of the judge to determine whether a given juvenile is likely to commit a crime before his trial. In making detention decisions, "each judge must rely on his own subjective

---

[6] The majority admits that "the Family Court judge is not required to make a finding of probable cause at the initial appearance," but contends that the juvenile has the option to challenge the sufficiency of the petition for delinquency on the ground that it fails to establish probable cause. *Ante,* at 276. None of the courts that have considered the constitutionality of New York's preventive-detention system has suggested that a juvenile has a statutory right to a probable-cause determination before he is detained. The provisions cited by the majority for its novel reading of the statute provide only shaky support for its contention. FCA § 315.1, which empowers the juvenile to move to dismiss a petition lacking allegations sufficient to satisfy § 311.2, provides that "[a] motion to dismiss under this section must be made within the time provided for in section 332.2." Section 332.2, in turn, provides that pretrial motions shall be made within 30 days *after* the initial appearance and before the factfinding hearing. If the juvenile has been detained, the judge is instructed to "hear and determine pre-trial motions on an expedited basis," § 332.2(4), but is not required to rule upon such motions peremptorily. In sum, the statutory scheme seems to contemplate that a motion to dismiss a petition for lack of probable cause, accompanied with "supporting affidavits, exhibits and memoranda of law," § 332.2(2), would be filed sometime after the juvenile is detained under § 320.5(3)(b). And there is no reason to expect that the ruling on such a motion would be rendered before the juvenile would in any event be entitled to a probable-cause hearing under § 325.1(2). That counsel for a juvenile ordinarily is not even appointed until a few minutes prior to the initial appearance, see *supra,* at 284 and this page, confirms this interpretation. The lesson of this foray into the tangled provisions of the New York Family Court Act is that the majority ought to adhere to our usual policy of relying whenever possible for interpretation of a state statute upon courts better acquainted with its terms and applications.

judgment, based on the limited information available to him at court intake and whatever personal standards he himself has developed in exercising his discretionary authority under the statute." *Ibid.* Family Court judges are not provided information regarding the behavior of juveniles over whose cases they have presided, so a judge has no way of refining the standards he employs in making detention decisions. *Id.*, at 712.

After examining a study of a sample of 34 cases in which juveniles were detained under § 320.5(3)(b)[7] along with various statistical studies of pretrial detention of juveniles in New York,[8] the District Court made findings regarding the

---

[7] The majority refuses to consider the circumstances of these 34 cases, dismissing them as unrepresentative, *ante*, at 272, n. 21, and focuses instead on the lurid facts associated with the cases of the three named appellees. I cannot agree that the sample is entitled to so little weight. There was uncontested testimony at trial to the effect that the 34 cases were typical. App. 128 (testimony of Steven Hiltz, an attorney with 8½ years of experience before the Family Court). At no point in this litigation have appellants offered an alternative selection of instances in which § 320.5(3)(b) has been invoked. And most importantly, despite the fact that the District Court relied heavily on the sample when assessing the manner in which the statute is applied, see 513 F. Supp., at 695–700, appellants did not dispute before the Court of Appeals the representativeness of the 34 cases, see *Martin* v. *Strasburg*, 689 F. 2d 365, 369, n. 19 (CA2 1982). When the defendants in a plaintiff class action challenge on appeal neither the certification of the class, see *ante*, at 261, n. 10, nor the plaintiffs' depiction of the character of the class, we ought to analyze the case as it comes to us and not try to construct a new version of the facts on the basis of an independent and selective review of the record.

[8] As the Court of Appeals acknowledged, 689 F. 2d, at 369, n. 18, there are defects in all of the available statistical studies. Most importantly, none of the studies distinguishes persons detained under § 320.5(3)(a) from persons detained under § 320.5(3)(b). However, these flaws did not disable the courts below from making meaningful—albeit rough—generalizations regarding the incidence of detention under the latter provision. Especially when conjoined with the sample of 34 cases submitted by appellees, see n. 7, *supra*, the studies are sufficient to support the three findings enumerated in the text. Even the majority, though it chastises appellees for failing to assemble better data, *ante*, at 272, and n. 21, does not suggest that those findings are clearly erroneous.

circumstances in which the provision habitually is invoked. Three of those findings are especially germane to appellees' challenge to the statute. First, a substantial number of "first offenders" are detained pursuant to § 320.5(3)(b). For example, at least 5 of the 34 juveniles in the sample had no prior contact with the Family Court before being detained and at least 16 had no prior adjudications of delinquency. *Id.*, at 695–700.[9] Second, many juveniles are released—for periods ranging from five days to several weeks—after their arrests and are then detained under § 320.5(3)(b), despite the absence of any evidence of misconduct during the time between their arrests and "initial appearances." Sixteen of the thirty-four cases in the sample fit this pattern. *Id.*, at 705, 713–714. Third, "the overwhelming majority" of the juveniles detained under § 320.5(3)(b) are released either before or immediately after their trials, either unconditionally or on parole. *Id.*, at 705. At least 23 of the juveniles in the sample fell into this category. *Martin* v. *Strasburg*, 689 F. 2d 365, 369, n. 19 (CA2 1982); see 513 F. Supp., at 695–700.

Finally, the District Court made a few significant findings concerning the conditions associated with "secure detention" pursuant to § 320.5(3)(b).[10] In a "secure facility," "[t]he juveniles are subjected to strip-searches, wear institutional clothing and follow institutional regimen. At Spofford [Juvenile Detention Center], which is a secure facility, some juveniles who have had dispositional determinations and were awaiting

---

[9] The figures in the text are taken from the District Court's summary of the 34 cases in the sample. Review of the transcripts of the hearings in those cases reveals the actual number to be 9 and 23, respectively. See Petitioners' Exhibits 6a, 11a, 12a, 14a, 15a, 16a, 19a, 24a, 35a.

[10] The state director of detention services testified that, in 1978, approximately six times as many juveniles were admitted to "secure facilities" as to "non-secure facilities." See 513 F. Supp., at 703, n. 8. These figures are not broken down as to persons detained under § 320.5(3)(a) and persons detained under § 320.5(3)(b). There seems no dispute, however, that most of the juveniles held under the latter provision are subjected to "secure detention."

placement (long term care) commingle with those in pretrial detention (short term care)." *Id.*, at 695, n. 5.

It is against the backdrop of these findings that the contentions of the parties must be examined.

## II

### A

As the majority concedes, *ante*, at 263, the fact that § 320.5(3)(b) applies only to juveniles does not insulate the provision from review under the Due Process Clause. "[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone." *In re Gault*, 387 U. S. 1, 13 (1967). Examination of the provision must of course be informed by a recognition that juveniles have different needs and capacities than adults, see *McKeiver* v. *Pennsylvania*, 403 U. S. 528, 550 (1971), but the provision still "must measure up to the essentials of due process and fair treatment," *Kent* v. *United States*, 383 U. S. 541, 562 (1966).

To comport with "fundamental fairness," § 320.5(3)(b) must satisfy two requirements. First, it must advance goals commensurate with the burdens it imposes on constitutionally protected interests. Second, it must not punish the juveniles to whom it applies.

The majority only grudgingly and incompletely acknowledges the applicability of the first of these tests, but its grip on the cases before us is undeniable. It is manifest that § 320.5(3)(b) impinges upon fundamental rights. If the "liberty" protected by the Due Process Clause means anything, it means freedom from physical restraint. *Ingraham* v. *Wright*, 430 U. S. 651, 673–674 (1977); *Board of Regents* v. *Roth*, 408 U. S. 564, 572 (1972). Only a very important government interest can justify deprivation of liberty in this basic sense.[11]

---

[11] This principle underlies prior decisions of the Court involving various constitutional provisions as they relate to pretrial detention. In *Gerstein*

The majority seeks to evade the force of this principle by discounting the impact on a child of incarceration pursuant to § 320.5(3)(b). The curtailment of liberty consequent upon detention of a juvenile, the majority contends, is mitigated by the fact that "juveniles, unlike adults, are always in some form of custody." *Ante*, at 265. In any event, the majority argues, the conditions of confinement associated with "secure detention" under § 320.5(3)(b) are not unduly burdensome. *Ante*, at 271. These contentions enable the majority to suggest that § 320.5(3)(b) need only advance a "legitimate state objective" to satisfy the strictures of the Due Process Clause. *Ante*, at 256–257, 263–264, 274.[12]

The majority's arguments do not survive scrutiny. Its characterization of preventive detention as merely a transfer of custody from a parent or guardian to the State is difficult to take seriously. Surely there is a qualitative difference between imprisonment and the condition of being subject to

v. *Pugh*, 420 U. S. 103, 113–114 (1975), we relied in part on the severity of "[t]he consequences of prolonged detention" in construing the Fourth Amendment to forbid pretrial incarceration of a suspect for an extended period of time without "a judicial determination of probable cause." In *Stack* v. *Boyle*, 342 U. S. 1, 4–5 (1951), we stressed the importance of a person's right to freedom until proved guilty in construing the Eighth Amendment to proscribe the setting of bail "at a figure higher than an amount reasonably calculated to" assure the presence of the accused at trial. Cf. *Baker* v. *McCollan*, 443 U. S. 137, 149–150, 153 (1979) (STEVENS, J., dissenting).

[12] The phrase "legitimate governmental objective" appears at several points in the opinion of the Court in *Bell* v. *Wolfish*, 441 U. S. 520 (1979), e. g., *id.*, at 538–539, and the majority may be relying implicitly on that decision for the standard it applies in these cases. If so, the reliance is misplaced. *Wolfish* was exclusively concerned with the constitutionality of *conditions* of pretrial incarceration under circumstances in which the legitimacy of the incarceration itself was undisputed; the Court avoided any discussion of the showing a State must make in order to justify pretrial detention in the first instance. See *id.*, at 533–534, and n. 15. The standard employed by the Court in *Wolfish* thus has no bearing on the problem before us.

the supervision and control of an adult who has one's best interests at heart. And the majority's depiction of the nature of confinement under § 320.5(3)(b) is insupportable on this record. As noted above, the District Court found that secure detention entails incarceration in a facility closely resembling a jail and that pretrial detainees are sometimes mixed with juveniles who have been found to be delinquent. *Supra*, at 287–288. Evidence adduced at trial reinforces these findings. For example, Judge Quinones, a Family Court Judge with eight years of experience, described the conditions of detention as follows:

> "Then again, Juvenile Center, as much as we might try, is not the most pleasant place in the world. If you put them in detention, you are liable to be exposing these youngsters to all sorts of things. They are liable to be exposed to assault, they are liable to be exposed to sexual assaults. You are taking the risk of putting them together with a youngster that might be much worse than they, possibly might be, and it might have a bad effect in that respect." App. 270.

Many other observers of the circumstances of juvenile detention in New York have come to similar conclusions.[18]

---

[18] All of the 34 juveniles in the sample were detained in Spofford Juvenile Center, the detention facility for New York City. Numerous studies of that facility have attested to its unsavory characteristics. See, *e. g.*, Citizens' Committee for Children of New York, Inc., Juvenile Detention Problems in New York City 3–4 (1970); J. Stone, R. Ruskin, & D. Goff, An Inquiry into the Juvenile Centers Operated by the Office of Probation 25–27, 52–54, 79–80 (1971). Conditions in Spofford have been successfully challenged on constitutional grounds (by a group of inmates of a different type), see *Martarella* v. *Kelley*, 359 F. Supp. 478 (SDNY 1973), but nevertheless remain grim, see Mayor's Task Force on Spofford: First Report v, viii–ix, 20–21 (June 1978). Not surprisingly, a former New York City Deputy Mayor for Criminal Justice has averred that "Spofford is, in many ways, indistinguishable from a prison." Petitioners' Exhibit 30, ¶ 6 (affidavit of Herbert Sturz, June 29, 1978).

In short, fairly viewed, pretrial detention of a juvenile pursuant to § 320.5(3)(b) gives rise to injuries comparable to those associated with imprisonment of an adult. In both situations, the detainee suffers stigmatization and severe limitation of his freedom of movement. See *In re Winship*, 397 U. S. 358, 367 (1970); *In re Gault*, 387 U. S., at 27. Indeed, the impressionability of juveniles may make the experience of incarceration more injurious to them than to adults; all too quickly juveniles subjected to preventive detention come to see society at large as hostile and oppressive and to regard themselves as irremediably "delinquent."[14] Such serious injuries to presumptively innocent persons—encompassing the curtailment of their constitutional rights to liberty—can be justified only by a weighty public interest that is substantially advanced by the statute.[15]

The applicability of the second of the two tests is admitted even by the majority. In *Bell* v. *Wolfish*, 441 U. S. 520, 535

[14] Cf. Aubry, The Nature, Scope and Significance of Pre-Trial Detention of Juveniles in California, 1 Black L. J. 160, 164 (1971).

[15] This standard might be refined in one of two ways. First, it might be argued that, because § 320.5(3)(b) impinges upon "[l]iberty from bodily restraint," which has long been "recognized as the core of the liberty protected by the Due Process Clause," *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1, 18 (1979) (POWELL, J., concurring in part and dissenting in part), the provision can pass constitutional muster only if it promotes a "compelling" government interest. See *People ex rel. Wayburn* v. *Schupf*, 39 N. Y. 2d 682, 687, 350 N. E. 2d 906, 908 (1976) (requiring a showing of a "compelling State interest" to uphold § 320.5(3)(b)); cf. *Shapiro* v. *Thompson*, 394 U. S. 618, 634 (1969). Alternatively, it might be argued that the comparatively brief period of incarceration permissible under the provision warrants a slight lowering of the constitutional bar. Applying the principle that the strength of the state interest needed to legitimate a statute depends upon the *degree* to which the statute encroaches upon fundamental rights, see *Williams* v. *Illinois*, 399 U. S. 235, 259–260, 262–263 (1970) (Harlan, J., concurring in result), it might be held that an important—but not quite "compelling"—objective is necessary to sustain § 320.5(3)(b). In the present context, there is no need to choose between these doctrinal options, because § 320.5(3)(b) would fail either test.

(1979), the Court held that an adult may not be punished prior to determination that he is guilty of a crime.[16]   The majority concedes, as it must, that this principle applies to juveniles.  *Ante,* at 264, 269.   Thus, if the only purpose substantially advanced by § 320.5(3)(b) is punishment, the provision must be struck down.

For related reasons, § 320.5(3)(b) cannot satisfy either of the requirements discussed above that together define "fundamental fairness" in the context of pretrial detention.

## B

Appellants and the majority contend that § 320.5(3)(b) advances a pair of intertwined government objectives: "protecting the community from crime," *ante,* at 264, and "protecting a juvenile from the consequences of his criminal activity," *ante,* at 266.   More specifically, the majority argues that detaining a juvenile for a period of up to 17 days prior to his trial has two desirable effects: it protects society at large from the crimes he might have committed during that period if released; and it protects the juvenile himself "both from potential physical injury which may be suffered when a victim fights back or a policeman attempts to make an arrest and from the downward spiral of criminal activity into which peer pressure may lead the child."  *Ante,* at 264–266.

Appellees and some *amici* argue that public purposes of this sort can never justify incarceration of a person who has not been adjudicated guilty of a crime, at least in the absence of a determination that there exists probable cause to believe he committed a criminal offense.[17]   We need not reach that

---

[16] See also *Ingraham* v. *Wright,* 430 U. S. 651, 671–672, and n. 40, 673–674 (1977); *Gregory* v. *Chicago,* 394 U. S. 111, 112 (1969); *Thompson* v. *Louisville,* 362 U. S. 199, 206 (1960).

[17] Cf. *Sellers* v. *United States,* 89 S. Ct. 36, 38, 21 L. Ed. 2d 64, 67 (1968) (Black, J., in chambers) (questioning whether a defendant's dangerousness can ever justify denial of bail).

categorial argument in these cases because, even if the purposes identified by the majority are conceded to be compelling, they are not sufficiently promoted by detention pursuant to § 320.5(3)(b) to justify the concomitant impairment of the juveniles' liberty interests.[18] To state the case more precisely, two circumstances in combination render § 320.5(3)(b) invalid *in toto:* in the large majority of cases in which the provision is invoked, its asserted objectives are either not advanced at all or are only minimally promoted; and, as the provision is written and administered by the state courts, the cases in which its asserted ends are significantly advanced cannot practicably be distinguished from the cases in which they are not.

1

Both of the courts below concluded that only occasionally and accidentally does pretrial detention of a juvenile under § 320.5(3)(b) prevent the commission of a crime. Three subsidiary findings undergird that conclusion. First, Family Court judges are incapable of determining which of the juveniles who appear before them would commit offenses before their trials if left at large and which would not. In part, this incapacity derives from the limitations of current knowledge concerning the dynamics of human behavior. On the basis of evidence adduced at trial, supplemented by a thorough review of the secondary literature, see 513 F. Supp., at 708–712, and nn. 31–32, the District Court found that "no diagnostic tools have as yet been devised which enable even the most highly trained criminologists to predict reliably which juveniles will engage in violent crime." *Id.,* at 708. The evidence supportive of this finding is overwhelm-

---

[18] An additional reason for not reaching appellees' categorical objection to the purposes relied upon by the State is that the Court of Appeals did not pass upon the validity of those objectives. See 689 F. 2d, at 372. We are generally chary of deciding important constitutional questions not reached by a lower court.

ing.[19]  An independent impediment to identification of the defendants who would misbehave if released is the paucity of data available at an initial appearance.  The judge must make his decision whether to detain a juvenile on the basis of a set of allegations regarding the child's alleged offense, a cursory review of his background and criminal record, and the recommendation of a probation officer who, in the typical case, has seen the child only once.  *Id.*, at 712.  In view of this scarcity of relevant information, the District Court credited the testimony of appellees' expert witness, who "stated that he would be surprised if recommendations based on intake interviews were better than chance and assessed the judge's subjective prognosis about the probability of future crime as only 4% better than chance—virtually wholly unpredictable."  *Id.*, at 708.[20]

---

[19] See, *e. g.*, American Psychiatric Association, Clinical Aspects of the Violent Individual 27–28 (1974); Cocozza & Steadman, The Failure of Psychiatric Predictions of Dangerousness: Clear and Convincing Evidence, 29 Rutgers L. Rev. 1084, 1094–1101 (1976); Diamond, The Psychiatric Prediction of Dangerousness, 123 U. Pa. L. Rev. 439 (1974); Ennis & Litwack, Psychiatry and the Presumption of Expertise: Flipping Coins In the Courtroom, 62 Calif. L. Rev. 693 (1974); Schlesinger, The Prediction of Dangerousness in Juveniles: A Replication, 24 Crime & Delinquency 40, 47 (1978); Steadman & Cocozza, Psychiatry, Dangerousness and the Repetitively Violent Offender, 69 J. Crim. L. & C. 226, 229–231 (1978); Wenk, Robison, & Smith, Can Violence Be Predicted?, 18 Crime & Delinquency 393, 401 (1972); Preventive Detention: An Empirical Analysis, 6 Harv. Civ. Rights—Civ. Lib. L. Rev. 289 (1971).

[20] The majority brushes aside the District Court's findings on this issue with the remark that "a prediction of future criminal conduct . . . forms an important element in many decisions, and we have specifically rejected the contention . . . 'that it is impossible to predict future behavior and that the question is so vague as to be meaningless.'"  *Ante*, at 278–279 (footnote and citation omitted).  Whatever the merits of the decisions upon which the majority relies, but cf., *e. g.*, *Barefoot* v. *Estelle*, 463 U. S. 880, 909 (1983) (MARSHALL, J., dissenting), they do not control the problem before us.  In each of the cases in which the Court has countenanced reliance upon a prediction of future conduct in a decisionmaking process impinging upon life or liberty, the affected person had already been convicted of a crime.  See *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1 (1979)

Second, § 320.5(3)(b) is not limited to classes of juveniles whose past conduct suggests that they are substantially more likely than average juveniles to misbehave in the immediate future. The provision authorizes the detention of persons arrested for trivial offenses[21] and persons without any prior contacts with juvenile court. Even a finding that there is probable cause to believe a juvenile committed the offense with which he was charged is not a prerequisite to his detention. See *supra*, at 285, and n. 6.[22]

---

(grant of parole); *Jurek* v. *Texas*, 428 U. S. 262 (1976) (death sentence); *Morrissey* v. *Brewer*, 408 U. S. 471 (1972) (parole revocation). The constitutional limitations upon the kinds of factors that may be relied on in making such decisions are significantly looser than those upon decisionmaking processes that abridge the liberty of presumptively innocent persons. Cf. *United States* v. *Tucker*, 404 U. S. 443, 446 (1972) ("[A] trial judge in the federal judicial system generally has wide discretion in determining what sentence to impose. . . . [B]efore making that determination, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come").

[21] For example, Tyrone Parson, aged 15, one of the members of the sample, was arrested for enticing others to play three-card monte. Petitioners' Exhibit 18b. After being detained for five days under § 320.5(3)(b), the petition against him was dismissed on the ground that "the offense alleged did not come within the provisions of the penal law." 513 F. Supp., at 698–699.

In contrast to the breadth of the coverage of the Family Court Act, the District of Columbia adult preventive-detention statute that was upheld in *United States* v. *Edwards*, 430 A. 2d 1321 (D. C. 1981), cert. denied, 455 U. S. 1022 (1982), authorizes detention only of persons charged with one of a prescribed set of "dangerous crime[s]" or "crime[s] of violence." D. C. Code §§ 23–1322(a)(1), (2) (1981).

Prediction whether a given person will commit a crime in the future is especially difficult when he has committed only minor crimes in the past. Cf. *Baldasar* v. *Illinois*, 446 U. S. 222, 231 (1980) (POWELL, J., dissenting) ("No court can predict with confidence whether a misdemeanor defendant is likely to become a recidivist").

[22] By contrast, under the District of Columbia statute, see n. 21, *supra*, the judge is obliged before ordering detention to find, *inter alia*, a "substantial probability" that the defendant committed the serious crime for which he was arrested. D. C. Code § 23–1322(b)(2)(C) (1981).

Third, the courts below concluded that circumstances surrounding most of the cases in which § 320.5(3)(b) has been invoked strongly suggest that the detainee would not have committed a crime during the period before his trial if he had been released. In a significant proportion of the cases, the juvenile had been released after his arrest and had not committed any reported crimes while at large, see *supra*, at 287; it is not apparent why a juvenile would be more likely to misbehave between his initial appearance and his trial than between his arrest and initial appearance. Even more telling is the fact that "the vast majority" of persons detained under § 320.5(3)(b) are released either before or immediately after their trials. 698 F. 2d, at 369; see 513 F. Supp., at 705. The inference is powerful that most detainees, when examined more carefully than at their initial appearances, are deemed insufficiently dangerous to warrant further incarceration.[23]

The rarity with which invocation of § 320.5(3)(b) results in detention of a juvenile who otherwise would have committed a crime fatally undercuts the two public purposes assigned to the statute by the State and the majority. The argument that § 320.5(3)(b) serves "the State's 'parens patriae interest in preserving and promoting the welfare of the child,'" *ante*, at 265 (citation omitted), now appears particularly hollow. Most juveniles detained pursuant to the provision are not

---

[23] Both courts below made this inference. See 689 F. 2d, at 372; 513 F. Supp., at 705. Indeed, the New York Court of Appeals, in upholding the statute, did not disagree with this explanation of the incidence of its application. *People ex rel. Wayburn* v. *Schupf*, 39 N. Y. 2d, at 690, 350 N. E. 2d, at 910.

Release (before or after trial) of some of the juveniles detained under § 320.5(3)(b) may well be due to a different factor: the evidence against them may be insufficient to support a finding of guilt. It is conceivable that some of those persons are so crime-prone that they would have committed an offense if not detained. But even the majority does not suggest that persons who could not be convicted of any crimes may nevertheless be imprisoned for the protection of themselves and the public.

benefited thereby, because they would not have committed crimes if left to their own devices (and thus would not have been exposed to the risk of physical injury or the perils of the cycle of recidivism, see *ante*, at 266). On the contrary, these juveniles suffer several serious harms: deprivation of liberty and stigmatization as "delinquent" or "dangerous," as well as impairment of their ability to prepare their legal defenses.[24] The benefits even to those few juveniles who would have committed crimes if released are not unalloyed; the gains to them are partially offset by the aforementioned injuries. In view of this configuration of benefits and harms, it is not surprising that Judge Quinones repudiated the suggestion that detention under § 320.5(3)(b) serves the interests of the detainees. App. 269–270.

The argument that § 320.5(3)(b) protects the welfare of the community fares little better. Certainly the public reaps no benefit from incarceration of the majority of the detainees who would not have committed any crimes had they been released. Prevention of the minor offenses that would have been committed by a small proportion of the persons detained confers only a slight benefit on the community.[25] Only in occasional cases does incarceration of a juvenile pending his trial serve to prevent a crime of violence and thereby significantly promote the public interest. Such an infrequent and haphazard gain is insufficient to justify curtailment of the lib-

---

[24] See testimony of Steven Hiltz, App. 130–134 (describing the detrimental effects of pretrial detention of a juvenile upon the preparation and presentation of his defense); cf. *Barker* v. *Wingo*, 407 U. S. 514, 533 (1972); *Bitter* v. *United States*, 389 U. S. 15, 16–17 (1967) *(per curiam); Stack* v. *Boyle*, 342 U. S., at 8; Miller, Preventive Detention—A Guide to the Eradication of Individual Rights, 16 How. L. J. 1, 15 (1970).

[25] Cf. Tribe, An Ounce of Detention: Preventive Justice in the World of John Mitchell, 56 Va. L. Rev. 371, 381 (1970) ("[Under a statute proposed by the Attorney General,] trivial property offenses may be deemed sufficiently threatening to warrant preventive imprisonment. No tenable concept of due process could condone a balance that gives so little weight to the accused's interest in pretrial liberty").

erty interests of all the presumptively innocent juveniles who would have obeyed the law pending their trials had they been given the chance.[26]

2

The majority seeks to deflect appellees' attack on the constitutionality of § 320.5(3)(b) by contending that they have framed their argument too broadly. It is possible, the majority acknowledges, that "in some circumstances detention of a juvenile [pursuant to § 320.5(3)(b)] would not pass constitutional muster. But the validity of those detentions must be determined on a case-by-case basis." *Ante*, at 273; see *ante*, at 268–269, n. 18. The majority thus implies that, even if the Due Process Clause is violated by most detentions under § 320.5(3)(b) because those detainees would not have committed crimes if released, the statute nevertheless is not invalid "on its face" because detention of those persons who would have committed a serious crime comports with the Constitution. Separation of the properly detained juveniles from the improperly detained juveniles must be achieved through "case-by-case" adjudication.

There are some obvious practical impediments to adoption of the majority's proposal. Because a juvenile may not be incarcerated under § 320.5(3)(b) for more than 17 days, it

---

[26] Some *amici* contend that a preventive-detention statute that, unlike § 320.5(3)(b), covered only specific categories of juveniles and embodied stringent procedural safeguards would result in incarceration only of juveniles very likely to commit crimes of violence in the near future. *E. g.*, Brief for American Bar Association as *Amicus Curiae* 9–14. It could be argued that, even though such a statute would unavoidably result in detention of *some* juveniles who would not have committed any offenses if released (because of the impossibility of reliably predicting the behavior of individual persons, see *supra*, at 293–294), the gains consequent upon the detention of the large proportion who would have committed crimes would be sufficient to justify the injuries to the other detainees. To decide the cases before us, we need not consider either the feasibility of such a scheme or its constitutionality.

would be impracticable for a particular detainee to secure his freedom by challenging the constitutional basis of his detention; by the time the suit could be considered, it would have been rendered moot by the juvenile's release or long-term detention pursuant to a delinquency adjudication.[27]  Nor could an individual detainee avoid the problem of mootness by filing a suit for damages or for injunctive relief.  This Court's declaration that § 320.5(3)(b) is not unconstitutional on its face would almost certainly preclude a finding that detention of a juvenile pursuant to the statute violated any clearly established constitutional rights; in the absence of such a finding all state officials would be immune from liability in damages, see *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982). And, under current doctrine pertaining to the standing of an individual victim of allegedly unconstitutional conduct to obtain an injunction against repetition of that behavior, it is far from clear that an individual detainee would be able to obtain

---

[27] The District Court, whose knowledge of New York procedural law surely exceeds ours, concluded that "[t]he short span of pretrial detention makes effective review impossible." 513 F. Supp., at 708, n. 29.  The majority dismisses this finding, along with a comparable finding by the Court of Appeals, see 689 F. 2d, at 373, as "mistaken." *Ante*, at 280.  But neither of the circumstances relied upon by the majority supports its confident judgment on this point.  That the New York courts suspended their usual rules of mootness in order to consider an attack on the constitutionality of the statute as a whole, see *People ex rel. Wayburn* v. *Schupf*, 39 N. Y. 2d, at 686, 350 N. E. 2d, at 907–908, in no way suggests that they would be willing to do so if an individual detainee challenged the constitutionality of § 320.5(3)(b) as applied to him.  The majority cites one case in which a detainee did obtain his release by securing a writ of habeas corpus.  However, that case involved a juvenile who was not given a probable-cause hearing within six days of his detention—a patent violation of the state statute.  See 513 F. Supp., at 708.  That a writ of habeas corpus could be obtained on short notice to remedy a glaring statutory violation provides no support for the majority's suggestion that individual detainees could effectively petition for release by challenging the constitutionality of their detentions.

an equitable remedy. Compare *INS* v. *Delgado*, 466 U. S. 210, 217, n. 4 (1984), with *Los Angeles* v. *Lyons*, 461 U. S. 95, 105–106 (1983).

But even if these practical difficulties could be surmounted, the majority's proposal would be inadequate. Precisely because of the unreliability of any determination whether a particular juvenile is likely to commit a crime between his arrest and trial, see *supra*, at 293–294, no individual detainee would be able to demonstrate that he would have abided by the law had he been released. In other words, no configuration of circumstances would enable a juvenile to establish that he fell into the category of persons unconstitutionally detained rather than the category constitutionally detained.[28] Thus, to protect the rights of the majority of juveniles whose incarceration advances no legitimate state interest, § 320.5(3)(b) must be held unconstitutional "on its face."

## C

The findings reviewed in the preceding section lend credence to the conclusion reached by the courts below: § 320.5(3)(b) "is utilized principally, not for preventive purposes, but to impose punishment for unadjudicated criminal acts." 689 F. 2d, at 372; see 513 F. Supp., at 715–717.

The majority contends that, of the many factors we have considered in trying to determine whether a particular sanction constitutes "punishment," see *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 168–169 (1963), the most useful are "whether an alternative purpose to which [the sanction] may

---

[28] This problem is exacerbated by the fact that Family Court judges, when making findings justifying a detention pursuant to § 320.5(3)(b), do not specify whether there is a risk that the juvenile would commit a serious crime or whether there is a risk that he would commit a petty offense. A finding of the latter sort should not be sufficient under the Due Process Clause to justify a juvenile's detention. See *supra*, at 297–298, and n. 25. But a particular detainee has no way of ascertaining the grounds for his incarceration.

rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned," *ibid.* (footnotes omitted). See *ante,* at 269. Assuming, *arguendo,* that this test is appropriate, but cf. *Bell v. Wolfish,* 441 U. S., at 564–565 (MARSHALL, J., dissenting), it requires affirmance in these cases. The alternative purpose assigned by the State to § 320.5(3)(b) is the prevention of crime by the detained juveniles. But, as has been shown, that objective is advanced at best sporadically by the provision. Moreover, § 320.5(3)(b) frequently is invoked under circumstances in which it is extremely unlikely that the juvenile in question would commit a crime while awaiting trial. The most striking of these cases involve juveniles who have been at large without mishap for a substantial period of time prior to their initial appearances, see *supra,* at 287, and detainees who are adjudged delinquent and are nevertheless released into the community. In short, § 320.5(3)(b) as administered by the New York courts surely "appears excessive in relation to" the putatively legitimate objectives assigned to it.

The inference that § 320.5(3)(b) is punitive in nature is supported by additional materials in the record. For example, Judge Quinones and even appellants' counsel acknowledged that one of the reasons juveniles detained pursuant to § 320.5(3)(b) usually are released after the determination of their guilt is that the judge decides that their pretrial detention constitutes sufficient punishment. 689 F. 2d, at 370–371, and nn. 27–28. Another Family Court Judge admitted using "preventive detention" to punish one of the juveniles in the sample. 513 F. Supp., at 708.[29]

---

[29] See transcript of the initial appearance of Ramon Ramos, #1356/80, Judge Heller presiding, Petitioners' Exhibit 42, p. 11:

"This business now of being able to get guns, is now completely out of proportion. We are living in a jungle. We are living in a jungle, and it is time that these youths that are brought before the Court, know that they

In summary, application of the litmus test the Court recently has used to identify punitive sanctions supports the finding of the lower courts that preventive detention under § 320.5(3)(b) constitutes punishment. Because punishment of juveniles before adjudication of their guilt violates the Due Process Clause, see *supra*, at 291–292, the provision cannot stand.

### III

If the record did not establish the impossibility, on the basis of the evidence available to a Family Court judge at a § 320.5(3)(b) hearing, of reliably predicting whether a given juvenile would commit a crime before his trial, and if the purposes relied upon by the State were promoted sufficiently to justify the deprivations of liberty effected by the provision, I would nevertheless still strike down § 320.5(3)(b) because of the absence of procedural safeguards in the provision. As Judge Newman, concurring in the Court of Appeals observed, "New York's statute is unconstitutional because it permits liberty to be denied, prior to adjudication of guilt, in the exercise of unfettered discretion as to an issue of considerable uncertainty—likelihood of future criminal behavior." 689 F. 2d, at 375.

Appellees point out that § 320.5(3)(b) lacks two crucial procedural constraints. First, a New York Family Court judge is given no guidance regarding what kinds of evidence he should consider or what weight he should accord different sorts of material in deciding whether to detain a juvenile.[30] For example, there is no requirement in the statute that the

---

are in a Court, and that if these allegations are true, that they are going to pay the penalty.

"As for the reasons I just state[d] on the record, . . . I am remand[ing] the respondent to the Commissioner of Juvenile Justice, secure detention."

[30] The absence of any limitations on the sorts of reasons that may support a determination that a child is likely to commit a crime if released means that the statutory requirement that the judge state "reasons" on the record, see *ante*, at 276, does not meaningfully constrain the decision-making process.

judge take into account the juvenile's background or current living situation. Nor is a judge obliged to attach significance to the nature of a juvenile's criminal record or the severity of the crime for which he was arrested.[31] Second, § 320.5(3)(b) does not specify how likely it must be that a juvenile will commit a crime before his trial to warrant his detention. The provision indicates only that there must be a "serious risk" that he will commit an offense and does not prescribe the standard of proof that should govern the judge's determination of that issue.[32]

Not surprisingly, in view of the lack of directions provided by the statute, different judges have adopted different ways of estimating the chances whether a juvenile will misbehave in the near future. "Each judge follows his own individual approach to [the detention] determination." 513 F. Supp., at 702; see App. 265 (testimony of Judge Quinones). This discretion exercised by Family Court judges in making detention decisions gives rise to two related constitutional problems. First, it creates an excessive risk that juveniles will be detained "erroneously"—*i. e.*, under circumstances in which no public interest would be served by their incarceration. Second, it fosters arbitrariness and inequality in a decisionmaking process that impinges upon fundamental rights.

## A

One of the purposes of imposing procedural constraints on decisions affecting life, liberty, or property is to reduce the

---

[31] See 513 F. Supp., at 713:
"Whether the juvenile was a first offender with no prior conduct, whether the court was advised that the juvenile was an obedient son or was needed at home, whether probation intake recommended parole, the case histories in this record disclose that it was not unusual for the court to discount these considerations and order remand based on a 5 to 15 minute evaluation."

[32] Cf. *Addington* v. *Texas*, 441 U. S. 418, 431–433 (1979) ("clear and convincing" proof constitutionally required to justify civil commitment to mental hospital).

incidence of error. See *Fuentes* v. *Shevin*, 407 U. S. 67, 80–81 (1972). In *Mathews* v. *Eldridge*, 424 U. S. 319 (1976), the Court identified a complex of considerations that has proved helpful in determining what protections are constitutionally required in particular contexts to achieve that end:

> "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.*, at 335.

As Judge Newman recognized, 689 F. 2d, at 375–376, a review of these three factors in the context of New York's preventive-detention scheme compels the conclusion that the Due Process Clause is violated by § 320.5(3)(b) in its present form. First, the private interest affected by a decision to detain a juvenile is personal liberty. Unnecessary abridgment of such a fundamental right, see *supra*, at 288, should be avoided if at all possible.

Second, there can be no dispute that there is a serious risk under the present statute that a juvenile will be detained erroneously—*i. e.*, despite the fact that he would not commit a crime if released. The findings of fact reviewed in the preceding sections make it apparent that the vast majority of detentions pursuant to § 320.5(3)(b) advance no state interest; only rarely does the statute operate to prevent crime. See *supra*, at 297–298. This high incidence of demonstrated error should induce a reviewing court to exercise utmost care in ensuring that no procedures could be devised that would improve the accuracy of the decisionmaking process. Opportunities for improvement in the extant regime are apparent

even to a casual observer. Most obviously, some measure of guidance to Family Court judges regarding the evidence they should consider and the standard of proof they should use in making their determinations would surely contribute to the quality of their detention determinations.[33]

The majority purports to see no value in such additional safeguards, contending that activity of estimating the likelihood that a given juvenile will commit a crime in the near future involves subtle assessment of a host of variables, the precise weight of which cannot be determined in advance. *Ante*, at 279. A review of the hearings that resulted in the detention of the juveniles included in the sample of 34 cases reveals the majority's depiction of the decisionmaking process to be hopelessly idealized. For example, the operative portion of the initial appearance of Tyrone Parson, the three-card monte player,[34] consisted of the following:

"COURT OFFICER: Will you identify yourself.

. . . . .

"TYRONE PARSON: Tyrone Parson, Age 15.
"THE COURT: Miss Brown, how many times has Tyrone been known to the Court?

. . . . .

"MISS BROWN: Seven times.

---

[33] Judge Newman, concurring below, pointed to three other protections lacking in § 320.5(3)(b): "the statute places no limits on the crimes for which the person subject to detention has been arrested . . . , the judge ordering detention is not required to make any evaluation of the degree of likelihood that the person committed the crime of which he is accused[,] . . . [and] the statute places no limits on the type of crimes that the judge believes the detained juvenile might commit if released." 689 F. 2d, at 377. In my view, the absence of these constraints is most relevant to the question whether the ends served by the statute can justify its broad reach, see Part II–B, *supra*. However, as Judge Newman observed, they could also be considered procedural flaws. Certainly, a narrowing of the categories of persons covered by § 320.5(3)(b), along the lines sketched by Judge Newman, would reduce the incidence of error in the application of the provision.

[34] See n. 21, *supra*.

"THE COURT: Remand the respondent." Petitioners' Exhibit 18a.[35]

This kind of parody of reasoned decisionmaking would be less likely to occur if judges were given more specific and mandatory instructions regarding the information they should consider and the manner in which they should assess it.

Third and finally, the imposition of such constraints on the deliberations of the Family Court judges would have no adverse effect on the State's interest in detaining dangerous juveniles and would give rise to insubstantial administrative burdens. For example, a simple directive to Family Court judges to state on the record the significance they give to the seriousness of the offense of which a juvenile is accused and to the nature of the juvenile's background would contribute materially to the quality of the decisionmaking process without significantly increasing the duration of initial appearances.

In summary, the three factors enumerated in *Mathews* in combination incline overwhelmingly in favor of imposition of more stringent constraints on detention determinations under § 320.5(3)(b). Especially in view of the impracticability of correcting erroneous decisions through judicial review, see *supra*, at 298–300, the absence of meaningful procedural safeguards in the provision renders it invalid. See *Santosky* v. *Kramer*, 455 U. S. 745, 757, and n. 9 (1982).

### B

A principle underlying many of our prior decisions in various doctrinal settings is that government officials may not be accorded unfettered discretion in making decisions that

---

[35] Parson's case is not unique. The hearings accorded Juan Santiago and Daniel Nelson, for example, though somewhat longer in duration, were nearly as cavalier and undiscriminating. See Petitioners' Exhibits 13a, 22a.

impinge upon fundamental rights. Two concerns underlie this principle: excessive discretion fosters inequality in the distribution of entitlements and harms, inequality which is especially troublesome when those benefits and burdens are great; and discretion can mask the use by officials of illegitimate criteria in allocating important goods and rights.

So, in striking down on vagueness grounds a vagrancy ordinance, we emphasized the "unfettered discretion it places in the hands of the . . . police." *Papachristou* v. *City of Jacksonville*, 405 U. S. 156, 168 (1972). Such flexibility was deemed constitutionally offensive because it "permits and encourages an arbitrary and discriminatory enforcement of the law." *Id.*, at 170. Partly for similar reasons, we have consistently held violative of the First Amendment ordinances which make the ability to engage in constitutionally protected speech "contingent upon the uncontrolled will of an official— as by requiring a permit or license which may be granted or withheld in the discretion of such official." *Staub* v. *City of Baxley*, 355 U. S. 313, 322 (1958); accord, *Shuttlesworth* v. *City of Birmingham*, 394 U. S. 147, 151, 153 (1969). Analogous considerations inform our understanding of the dictates of the Due Process Clause. Concurring in the judgment in *Zablocki* v. *Redhail*, 434 U. S. 374 (1978), striking down a statute that conditioned the right to marry upon the satisfaction of child-support obligations, JUSTICE POWELL aptly observed:

> "Quite apart from any impact on the truly indigent, the statute appears to 'confer upon [the judge] a license for arbitrary procedure,' in the determination of whether an applicant's children are 'likely thereafter to become public charges.' A serious question of procedural due process is raised by this feature of standardless discretion, particularly in light of the hazards of prediction in this area." *Id.*, at 402, n. 4 (quoting *Kent* v. *United States*, 383 U. S., at 553).

The concerns that powered these decisions are strongly implicated by New York's preventive-detention scheme. The effect of the lack of procedural safeguards constraining detention decisions under § 320.5(3)(b) is that the liberty of a juvenile arrested even for a petty crime is dependent upon the "caprice" of a Family Court judge. See 513 F. Supp., at 707. The absence of meaningful guidelines creates opportunities for judges to use illegitimate criteria when deciding whether juveniles should be incarcerated pending their trials—for example, to detain children for the express purpose of punishing them.[36] Even the judges who strive conscientiously to apply the law have little choice but to assess juveniles' dangerousness on the basis of whatever standards they deem appropriate.[37] The resultant variation in detention decisions gives rise to a level of inequality in the deprivation of a fundamental right too great to be countenanced under the Constitution.

### IV

The majority acknowledges—indeed, founds much of its argument upon—the principle that a State has both the power and the responsibility to protect the interests of the children within its jurisdiction. See *Santosky* v. *Kramer, supra,* at 766. Yet the majority today upholds a statute whose net impact on the juveniles who come within its purview is overwhelmingly detrimental. Most persons detained under the provision reap no benefit and suffer serious injuries thereby. The welfare of only a minority of the detainees is even arguably enhanced. The inequity of this regime, combined with

---

[36] See n. 29, *supra.*

[37] See 513 F. Supp., at 708:

"It is clear that the judge decides on pretrial detention for a variety of reasons—as a means of protecting the community, as the policy of the judge to remand, as an express punitive device, or because of the serious nature of the charge[,] among others" (citations omitted).

the arbitrariness with which it is administered, is bound to disillusion its victims regarding the virtues of our system of criminal justice. I can see—and the majority has pointed to—no public purpose advanced by the statute sufficient to justify the harm it works.

I respectfully dissent.