816 F.2d 680
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Jeremy S. LANCE, Plaintiff-Appellant,
v.
WARREN COUNTY, TENNESSEE, et al., Defendants-Appellees.
 No. 85-5630.
 United States Court of Appeals, Sixth Circuit.
 April 24, 1987.
 
 Before LIVELY, Chief Judge, and WELLFORD and NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 This is an appeal from a summary judgment in favor of the defendants in a rather unusual civil rights case. The plaintiff, Jeremy Lance, was arrested in his home, without a warrant, at 10:30 at night on June 5, 1984. At the time of his arrest he was five years old. Over the protests of his mother, who was not allowed to accompany him, a deputy sheriff took Jeremy to jail in a patrol car and detained him there for questioning about vandalism at a construction site. With a scrupulosity that might seem surprising, given the Jeremy's tender years, county officials read the child his "Miranda rights" before the interrogation began. The results of the questioning seem to have been somewhat inconclusive, and Jeremy was released at 2:00 o'clock the next morning.
 
 
 2
 In due course Jeremy filed a complaint against the county and others under 42 U.S.C. Sec. 1983, suing through his mother as next friend. Nine weeks later he moved for leave to amend his complaint to allege that the defendants had acted together to violate his rights under the Fifth and Fourteenth Amendments, to make it clear that the arresting officer and others were being sued individually as well as in their official capacities, to allege that Jeremy was the victim of an established pattern of civil rights violations by the defendant county, and to allege that a juvenile court officer participated in a conspiracy to violate the child's civil rights. The trial court dismissed the action without having ruled on the motion to amend the complaint. We think the court abused its discretion in failing to allow the complaint to be amended, and we believe that a properly amended complaint could state a claim on which Jeremy must be allowed to proceed to trial if his mother wishes We shall therefore reverse the judgment and remand the case for further proceedings.
 
 
 3
 * It appears from the affidavits and pleadings filed in the trial court that Mr. Gordon McGee, one of the defendants, owned a lot on which a house was being constructed. Sometime during the day on June 5, 1984, two or more children did substantial damage to the house, breaking windows and light fixtures, poking holes in the walls, and damaging the gutters. A neighbor alerted Mr. McGee, who, understandably upset, went to the Warren County Jail and demanded that some action be taken. Defendant Dale Potter, a Warren County youth services officer, advised Mr. McGee that juvenile court proceedings could be instituted against those suspected of having caused the damage. Mr. McGee requested that such proceedings be brought against two children (one of them Jeremy) whose names were furnished by a person not a party to this litigation. Petitions were drafted by Mr. Potter and presumably were verified by Mr. McGee in accordance with Chapter 37 of the Tennessee Code Annotated. That chapter provides that a juvenile court proceeding may be commenced by the filing of a verified petition containing a statement of jurisdictional facts, a statement that it is in the best interest of the child and the public that the proceeding be brought, and, if delinquency or unruly conduct is alleged, a statement that the child is in need of treatment or rehabilitation. We have not been favored with copies of the petitions in question.
 
 
 4
 T.C.A. Sec. 33-1-121(a) provides that after the petition has been filed, the Juvenile court shall fix a time for a hearing thereon and shall direct the issuance of a summons to the child's parents or guardian. Acting as an officer of the court, Mr. Potter issued such a summons (addressed to "any lawful officer"), directing that Billie Jean Lance, Jeremy's mother, appear before the Juvenile Court at 9:00 a.m. on June 14, 1984, to answer the charge of the petition. The summons directed Mrs. Lance to bring Jeremy with her.
 
 
 5
 For reasons not explained in the record, the "lawful officer" who served the summons and petition, Deputy Sheriff Billy Prater, was not content to rely on Mrs. Lance to bring Jeremy in on June 14; he took the child into custody himself--sans mother--nine days before the date fixed in the summons.
 
 
 6
 Jeremy's complaint--never controverted by the county defendants--alleges that:
 
 
 7
 "1. On or about June 12, [sic] 1984, at approximately 10:30 p.m., five-year-old Jeremy S. Lance was asleep at his home. The defendant, Warren County Deputy Sheriff Billy Prater, arrived at the home of the plaintiff at this time. The defendant, Billy Prater, removed the five-year-old plaintiff from his home, placed him in a Warren County Sheriff's patrol car and drove him off to jail. The defendant, Prater, did this in spite of the protestations of the mother. The defendant, Prater, would not allow the mother of the five-year-old plaintiff to accompany him in the patrol car but did allow the plaintiff's minor sister to ride with him.
 
 
 8
 2. The defendant, Billy Prater, took this five-year-old plaintiff and his sister to the Warren County Jail. The mother followed along afterward. The plaintiff, Jeremy S. Lance, was detained at the Warren County Jail from approximately 11 o'clock on the date aforementioned until approximately two a.m. on June 13, [sic] 1984. While there, he was questioned, had his "Miranda rights" read to him, and was asked if he understood them. Finally, at approximately two a.m., the plaintiff, Jeremy S. Lance, was allowed to return home with his mother and sister, after being told that he would have to be present in court on June 14, 1984 in the Juvenile Court of Warren County, Tennessee."
 
 
 9
 The hearing scheduled for June 14 never was held, it appears. An affidavit executed by Mr. Potter states that subsequent to the night of Jeremy's arrest and interrogation
 
 
 10
 "I ... discussed this matter with the Juvenile Judge and requested that I be permitted to dismiss the Petition & The Petitions were dismissed because I had some doubt that these two juveniles [the other of whom was seven years old] did all the damage, because of their ages, and because the Department of Human Services was already involved and I felt like it would be unnecessary to go through the court process."
 
 
 11
 The affidavit of a Mr. Smartt, who talked with Mr. Potter July 13, 1984, attributes to Mr. Potter a statement to the effect that "he [Mr. Potter] didn't think that the kids knew that the things they did were wrong, after talking with them at the jail."
 
 
 12
 Jeremy filed his Sec. 1983 action against the County, the deputy sheriff, Mr. McGee, and others on March 21, 1985. Mr. McGee filed an answer stating, in essence, that he was a private citizen who had not acted under color of law and that he did not know what Deputy Sheriff Prater did after the lodging of the complaint on June 5. Appended to Mr. McGee's answer was a counterclaim against Jeremy and his mother, alleging that Mrs. Lance had failed to exercise reasonable supervision and control over Jeremy and that the latter had caused damage to Mr. McGee's partially built house in the amount of approximately $2500.
 
 
 13
 The remaining defendants did not answer the complaint, but on May 8, 1985, they filed a motion to dismiss or, in the alternative, for summary judgment. Jeremy's motion to amend his complaint was filed on May 28. On June 13, 1985, without addressing the motion to amend, the trial court filed a memorandum and order granting summary judgment to all defendants, including Mr. McGee, whose counterclaim was dismissed as well. The essence of the trial court's ruling was that "while the facts of this case show a surprising lack of good judgment, they do not rise to the level of a constitutional tort."
 
 II
 
 14
 We agree that the county showed poor judgment in taking a five-year-old child into custody late at night without a warrant or other authorization, when neither the welfare of the child nor the exigencies of the matter under investigation furnished any legitimate reason for doing so. We do not agree that it was impossible for such action to have risen to the level of a constitutional tort, and we think the plaintiff ought to have been permitted to file an amended complaint. Rule 15, Fed. R.Civ.P., says that leave to amend "shall be freely given when justice so requires," and there is no reason to suppose that the defendants--who had ample notice of "the fact situation upon which the amendment is based"--would have been prejudiced in any way by the granting of a motion to amend that followed the original complaint by only nine weeks and that apparently came before any discovery proceedings had been initiated. Hageman v. Signal LP Gas, Inc., 486 F.2d 479, 484-85 (6th Cir. 1973); Estes v. Kentucky Utilities Co., 636 F.2d 1131, 1134 (6th Cir. 1980).
 
 
 15
 We do not have the precise text of the proposed amendment, but it evidently did not refer specifically to the Fourth Amendment of the United States Constitution. Like the original complaint, however, it did allege violations of the Fifth and Fourteenth Amendments. On appeal, Jeremy contends that the defendants' actions violated his rights under both the Fourth and Fifth Amendments, as made applicable to the states by the Fourteenth Amendment, and we assume that a reference to the Fourth Amendment would be included in any amended complaint filed after the remand.
 
 
 16
 The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." It is well established that "[tlhe simple language of the [Fourth] Amendment applies equally to seizures of persons and to seizures of property." Payton v. New York, 445 U.S. 573, 576 (1980).
 
 
 17
 The Constitution was not written for adults alone, Schall v. Martin, 467 U.S. 253 (1984), and if, as the county seems to have believed, Jeremy was entitled to the same constitutional protection against self-incrimination that grownups have, it is hard to see why he should have no constitutional protection against unreasonable seizure. "At the very core [of the Fourth Amendmentl," the Supreme Court has told us, "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511 (1961). The right of a small boy to retire to his bed without being subjected to such intrusion is surely no less at the "core" of the Fourth Amendment. Seizure of any person--man or boy, woman or girl--inside that person's home without a warrant is "presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). Absent "special circumstances," Payton held, warrantless arrests in the home are unconstitutional. No such special circumstances existed here.
 
 
 18
 T.C.A. Sec. 37-1-113 lists four circumstances under which a child may be taken into custody, and the statute goes on to provide that the taking of a child into custody in accordance with its terms "is not an arrest, except for the purpose of determining its validity under the constitution of this state or of the United States." Under the statute, a child may be taken into custody
 
 
 19
 --pursuant to an order of the juvenile court;
 
 
 20
 --pursuant to "the laws of arrest;"
 
 
 21
 --where there are reasonable grounds to believe that the child is neglected or abused, and no less drastic alternative to removal of the child from parental custody would adequately guard against an immediate threat to his health or safety; or
 
 
 22
 --there are reasonable grounds to believe that the child has run away from his parents or guardian.
 
 
 23
 This case presented none of the four circumstances set forth in the statute. Jeremy was not taken into custody pursuant to a juvenile court order or pursuant to the laws of arrest, there was no immediate threat to his health or safety, and he had not run away from his parents or guardian. The "laws of arrest" might have justified taking Jeremy into custody without a warrant if law officers would have been endangered by his remaining at liberty or if some loss or destruction of evidence had been threatened, see Arkansas v. Sanders, 442 U.S. 753, 759 (1979), but it would be difficult to imagine a less threatening situation than this one. Unless he was unusually precocious, Jeremy had not yet graduated from kindergarten. He was asleep in his own bed in his own house. He was not about to flee the jurisdiction, destroy evidence, or do bodily harm to the process servers of the Warren County Sheriff's Department. There was no conceivable justification for taking him to jail.
 
 
 24
 The best the county defendants have been able to do in attempting to explain why Jeremy's arrest was not unreasonable is to point out that "juvenile proceedings had been commenced by the issuance of a petition" and that this case "involves a juvenile matter in which the state had an interest in the welfare of the child." The mere commencement of juvenile proceedings by the issuance of a petition, however, is no basis for taking the juvenile into custody under T.C.A. Sec. 37-1-113. Neither are we persuaded that the "welfare of the child" was better served by interrogating him until 2:00 a.m. in the county jail than it would have been by talking with him in his home the next morning or questioning him in court on the morning of June 14, the time that commended itself to the juvenile court officer who issued the summons for Jeremy's mother.
 
 
 25
 The question whether Jeremy has a claim cognizable in the federal courts against any of the defendants--like the question whether Mr. McGee may go to trial on his $2500 counterclaim--can best be decided by the trial court after the filing of an amended complaint.
 
 
 26
 The judgment of the district court is REVERSED, and the cause is REMANDED for further proceedings not inconsistent with this opinion.
 
 
 27
 DAVID A. NELSON, Circuit Judge, concurring.
 
 
 28
 I concur in the opinion and judgment of the court, and write separately only to express the personal hope that the parties will be able to resolve this case amicably prior to trial. Jeremy has undoubtedly learned that it is wrong to break other people's windows, and the Warren County defendants are undoubtedly better informed now on the law governing arrests of young children. Accepting, as I do, the finding of the district court that no harassment was intended here, I must say that I doubt any useful purpose would be served by pursuing this litigation to final judgment.